**Byron Lewis BLACK,**

v.

**Ricky BELL.**

**No. 3:00–0764.**

United States District Court,
M.D. Tennessee,
Nashville Division.

Dec. 11, 2001.

---

Paul Bottei, Nashville, TN, for plaintiff.

Joseph F. Whalen, III, Nashville, TN, for defendant.

### MEMORANDUM

CAMPBELL, District Judge.

#### I. *Introduction*

·Pending before the Court are Respondent's Motion For Summary Judgment (Docket No. 27), and Petitioner's Response (Docket No. 72) to the Motion. For the reasons set forth below, the Motion For Summary Judgment is GRANTED.

#### II. *Procedural and Factual Background*

In 1989, Petitioner was convicted in Davidson County Criminal Court of three counts of first degree murder and one count of burglary in connection with the killing of his girlfriend, Angela Clay, and her two minor daughters, Lakeisha and Latoya. (*See State v. Black*, 815 S.W.2d 166 (Tenn.1991); Addendum 12). The Petitioner received a death sentence for the murder of Lakeisha, consecutive life sentences for the other two murder convictions, and a fifteen-year sentence for the burglary conviction. *Id.* Petitioner's con-

victions and sentence were affirmed on direct appeal. *Id.*

In 1992, Petitioner filed a petition for post conviction relief in the Davidson County Criminal Court. (Addendum 14, Vol. I). After holding an evidentiary hearing, the trial court denied post conviction relief. (Addendum 14, vol. II). That judgment was affirmed on appeal by the Tennessee Court of Criminal Appeals. (*Black v. State*, 1999 WL 195299 (Tenn. Crim.App. April 8, 1999); Addendum 25). Petitioner's application for permission to appeal to the Tennessee Supreme Court was denied on September 13, 1999. (Addendum 28).

Invoking the provisions of 28 U.S.C. § 2254, Petitioner subsequently filed a Petition, and later an Amended Petition, seeking federal habeas relief on numerous grounds. (Docket Nos. 1, 8). The Respondent has filed the pending Motion seeking dismissal of Petitioner's claims, and the Petitioner has filed a response to the Motion.

The facts surrounding Petitioner's convictions were described by the Tennessee Supreme Court in its opinion on direct appeal as follows:

The police arrived at approximately 9:30 p.m. on Monday evening, March 28, 1988, and found no signs of forced entry into the apartment; the door was locked. Officer James was able to open a window after prying off a bedroom window screen. All the lights were off. He shined a flashlight into a child's room and saw a pool of blood on the bed and the body of a small child on the floor. He exited the room, and officers secured the scene.

Investigation revealed the bodies of Angela and her nine year old daughter, Latoya, in the master bedroom. Angela, who was lying in the bed, had apparently been shot once in the top of the head as she slept and was rendered unconscious immediately and died within minutes. Dr. Charles Harlan, Chief Medical Examiner for Davidson County, testified that she was probably shot from a distance of six to twelve inches and that her gunshot wound was the type usually caused by a large caliber bullet.

Latoya's body was found partially on the bed and partially off the bed, wedged between the bed and a chest of drawers. She had been shot once through the neck and chest. Blood on her pillow and a bullet hole in the bedding indicated she had been lying on the bed when shot. Dr. Harlan testified that she was shot from a distance of greater than twenty-four inches from the skin surface. The bullet path and type of shot indicated that death was not instantaneous but likely occurred within three to ten minutes after her being shot. Bullet fragments were recovered from her left lung. Both victims were under the bedcovers when they were shot.

The body of Lakeisha, age six, was found in the second bedroom lying facedown on the floor next to her bed. She had been shot twice, once in the chest, once in the pelvic area. Dr. Harlan testified that she had died from bleeding as a result of a gunshot wound to the chest. She was shot from a distance of six to twelve inches and died within five to thirty minutes after being shot.

Abrasions on her arm indicated a bullet had grazed her as she sought to protect herself from the attacker. Bullet holes and blood stains on the bed indicated that she was lying in bed when shot and had moved from the bed to the floor after being shot. There were bloody finger marks down the rail running from the head of the bed to the foot

of the bed. The size of the wounds and the absence of bullet casings indicated that a large caliber revolver had been used to kill the victims.

One projectile was collected from the pillow where Latoya was apparently lying at the time she was shot. Fragments of projectiles were collected from the wall above Angela's head; others were collected from the mattress where Lakeisha was found.

The receiver from the kitchen telephone was found in the master bedroom. The telephone from the master bedroom was lying in the hallway between the two bedrooms. The Defendant's fingerprints were the only prints recovered from the telephones. Two of his fingerprints were found on the phone in the hallway, and one was on the kitchen telephone receiver found in the master bedroom.

815 S.W.2d at 171–72.

## III. *The Standards for Considering Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In order to prevail, the movant has the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In determining whether the movant has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S.

574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In order to defeat the motion, the nonmoving party is required to show, after an adequate time for discovery, that there is a genuine issue of fact as to every essential element of that party's case upon which he will bear the burden of proof at trial. *Celotex Corp.,* 106 S.Ct. at 2553, 106 S.Ct. 2548. In order to create a genuine factual issue, the nonmoving party must show there is sufficient evidence favoring the nonmoving party for the factfinder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Although the nonmovant need not show that the disputed issue should be resolved in his favor, he must demonstrate that there are genuine factual issues that "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.*

## IV. *Analysis*

### A. *Governing Law*

██ The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, applies to all habeas petitions filed after April 24, 1996, the effective date of the Act. *Mitchell v. Mason,* 257 F.3d 554, 560–61 (6th Cir. 2001). As Black's Petition was filed on August 14, 2000, and after the effective date, this case is governed by the AEDPA.

#### 1. *Procedural Default*

Respondent argues that the Court should not reach the merits of several of Petitioner's claims because Petitioner failed to raise those claims in state court, and has, therefore, procedurally defaulted those claims.

██ Subsection (b)(1)(A) of 28 U.S.C. § 2254 requires a habeas corpus petitioner

to exhaust the remedies available to him in state court before raising a claim in federal court. If the petitioner has no remedy currently available in state court, however, the exhaustion requirement is satisfied, but the claims are procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 2554–55, 115 L.Ed.2d 640 (1991); *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir.2001), *cert. granted,* —— U.S. ——, 122 S.Ct. 663, —— L.Ed.2d —— (2001).

A petitioner may avoid this procedural bar by showing cause for the default, and that prejudice resulted from the default, or by showing that failure to consider the claims will result in a fundamental miscarriage of justice. *Id.; Edwards v. Carpenter*, 529 U.S. 446, 120 S.Ct. 1587, 1591, 146 L.Ed.2d 518 (2000).

Exhaustion requires that petitioners give state courts "a fair opportunity" to act on claims before they are presented to the federal courts. *O'Sullivan v. Boerckel*, 526 U.S. 838, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999). To satisfy the exhaustion requirement, a petitioner must invoke one complete round of the state's established review process, including the filing of a petition for discretionary review with the state's highest court. *Id.*

In this case, Petitioner may no longer present claims to the state courts because those claims would be barred by the statute of limitations. *See* Tenn.Code Ann. § 40–30–202.[1] Thus, those claims that have not been exhausted are procedurally defaulted because Petitioner has no remedy currently available in state court. The Court discusses Petitioner's grounds for avoiding the procedural bar in discussing particular claims.

### 2. Adequate and independent state grounds

Respondent contends that the state court's reliance on certain state procedural rules in rejecting certain of Petitioner's claims bars federal review of those claims. In order to rely on this procedural default doctrine, Respondent must show that: (1) there is an applicable state procedural rule with which the Petitioner failed to comply; (2) the state rule is one that is firmly established and regularly followed; (3) the rule is an adequate and independent state ground on which the state may rely to foreclose review of the federal constitutional claim. *Mitchell v. Mason*, 257 F.3d at 562; *Coleman v. Mitchell*, 244 F.3d 533, 539 (6th Cir.2001). Furthermore, the state rule bars the claim only if the last reasoned decision of the state court invoked the rule as a basis for its decision to reject review of the Petitioner's federal claim. *Id.*

If the Court determines that the state courts complied with a state procedural rule and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or by showing that failure to consider the claim will result in a fundamental miscarriage of justice. *Id.; Edwards v. Carpenter*, 120 S.Ct. at 1591.

---

1. After filing its response to the pending motion, the Petitioner filed a Motion To Stay Proceedings And Hold Case In Abeyance Pending Exhaustion Of State Court Remedies (Docket No. 79), in which he contends that the Tennessee Supreme Court recently provided him with an avenue for relief for the mental retardation claim made in Paragraph 14 of the Amended Petition. As the Court addressed this claim on the merits, and did not rely on the procedural default defense, the Court finds it unnecessary to address the procedural default issue as it relates to Paragraph 14.

### 3. State Court Determinations on the Merits

█ When a claim is addressed on the merits by a state court, a federal court may grant habeas relief as to that claim only if the state court's adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). With respect to the state court's factual determinations, the factual findings of a state court are presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

█ In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000), the Supreme Court held that a state court decision is "contrary to" Supreme Court precedent if either the "state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."

█ The *Williams* Court held that a state court decision involves an "unreasonable application" of clearly established law if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the petitioner's case. *Id.* The reasonableness of the state court's opinion is judged by an objective rather than subjective standard. 120 S.Ct. at 1521–22.

### B. Petitioner's Claims

#### Paragraph 6: Competence of Defendant to Stand Trial

In Paragraph 6, Petitioner alleges that he was not competent during his trial, during the appeal, or during the post-conviction proceedings; and that he did not receive a comprehensive competency evaluation during the critical stages of the proceedings against him, in violation of the Sixth, Eighth and Fourteenth Amendments. Respondent argues that Petitioner failed to raise certain aspects of this competency claim at the time of his appeal or during post-conviction proceedings, and that therefore, those aspects of the claim are procedurally defaulted. Although Petitioner appealed the issue of his competence at trial on direct appeal, Respondent contends that he did not base that claim on the Eighth Amendment, and did not identify the diagnoses that he relies on now. As to the lack of a comprehensive competency evaluation, Respondent argues that Petitioner fails to state a cognizable claim for habeas relief, as Petitioner was entitled only to a competency hearing, and he received such a hearing.

The Court is persuaded that Petitioner adequately raised the issue of his competence to stand trial in his direct appeal. On appeal, the Tennessee Supreme Court discussed that issue as follows:

> The Defendant first contends that the trial court erred in ruling that he was competent to stand trial. Ten days before trial, upon motion of defense counsel, the trial court conducted a hearing for purposes of assessing the Defendant's competency to stand trial. During the hearing, the trial court stated that he had considered the standard of competence set out in *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), *Mackey v. State*, 537 S.W.2d 704 (Tenn.Crim.App.1975), as

well as the most recent case of *State v. Benton,* 759 S.W.2d 427 (Tenn.Crim. App.1988). In *Dusky v. United States, supra,* the United States Supreme Court described the standard under which a trial court determines whether a Defendant is competent to stand trial:

'... the test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.' 80 S.Ct. at 788–89.

The *Dusky* standard was adopted in *Mackey v. State, supra,* which held:

'Both Tennessee decisions and the federal constitution prohibit the trial of a defendant whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense.' 537 S.W.2d at 707.

The purpose of a competency hearing does not concern the Defendant's guilt or innocence, or even his mental condition at the time of the crime. In *State v. Stacy,* 556 S.W.2d 552 (Tenn.Crim.App. 1977), the Court described the inquiry as follows:

'[A] competency hearing is a very narrow inquiry aimed at determining whether one who is charged with a criminal offense is presently competent to stand trial. In this State, a defendant is considered competent to stand trial if he has mind and discretion which would enable him to appreciate the charges against him, the proceedings thereon, and enable him to make a proper defense.' 556 S.W.2d at 553.

The trial judge, in discussing the burden of proof, stated: 'If the Defendant raises a viable question about competency, then the burden is on the state to prove competency [by a preponderance of the evidence that the Defendant is competent to stand trial].' The Defendant submits that the evidence adduced at the competency hearing established that he lacked the capacity to understand the nature and object of the proceedings against him and that he had insufficient ability to consult with counsel and to assist in preparing his defense.

At the competency hearing the Defendant presented the testimony of Dr. Kenneth Anchor, a licensed psychologist who had tested and interviewed Defendant, and of Ross Alderman, one of the Defendant's attorneys. The substance of their testimony was that the Defendant did not comprehend the judicial process (e.g., he was unable to distinguish between the roles of the judge and jury), did not understand his counsel's role, and was unable to fathom the possible consequences of the trial. In their opinion, the Defendant was unable to assist his attorney in the preparation of his defense. The State presented the testimony of a clinical psychologist, a psychiatrist, and a social worker from the Dede Wallace Mental Health Center, all of whom had also interviewed the Defendant. They concluded that the Defendant was competent to stand trial. The consensus of the mental health professionals was that the Defendant's I.Q. was in the lower end of the normal range (76, according to Dr. Anchor) and that the Defendant was not psychotic or delusional, although he probably suffered a personality disorder of some sort.

At the conclusion of the hearing, the trial judge stated, 'Given the seriousness

of this matter, I feel that I'm going to appoint a psychiatrist to do an independent evaluation and report back to the court.' He appointed Dr. William Kenner to do the evaluation and reset the matter for further hearing. Dr. Kenner, after interviewing the Defendant, testified that the Defendant was 'clearly competent.' The court thereupon stated, 'I think that the Defendant presently has the ability to consult with his lawyer with a reasonable degree of rational understanding, and he has a rational as well as factional understanding of the proceedings against him. In my opinion, he is competent to stand trial.' Later, after the trial had begun and defense counsel had again raised the issue, Dr. Kenner testified at the conclusion of voir dire that after interviewing Defendant a second time, he found the Defendant 'still competent.' Dr. Kenner stated that the Defendant not only met but went beyond the minimum threshold for competency. Relying on Dr. Kenner's evaluation and its own observations of Defendant during voir dire, the trial judge reaffirmed his ruling that Defendant was competent to stand trial.

Under the standards enunciated in *Dusky, Mackey* and *Benton,* we are of the opinion that the Defendant understood the nature and object of the proceedings against him and was able to consult with and assist counsel in preparing his defense. The evidence does not preponderate against the trial court's finding of competence.

815 S.W.2d at 173–75.

▮ Petitioner argues that the Court should disregard the state courts' findings of competence under Section 2254(e)(1) because there is clear and convincing evidence that the state court's conclusion was factually incorrect. Petitioner submits the reports of various experts regarding his mental state. These reports do not, however, state that the Petitioner was not competent at the time of his trial in 1989. For example, Dr. Ruben C. Gur, a neuropsychologist, states that Petitioner's mental impairments "would seriously interfere with his ability to keep pace with courtroom proceedings." (Petitioner's Exhibit 1, at ¶ 12). Dr. Albert Globus, a psychiatrist, opines that Petitioner's mental impairments have "rendered him so defective in understanding that he cannot ably and reasonably assist his attorney in his defense." (Petitioner's Exhibit 2, at 8). Patty Van Eys, who administered certain tests to the Petitioner, concluded that his shortcomings "would predictably make it quite difficult to understand the true complexities of his current situation." (Petitioner's Exhibit 4, at 5). None of these experts state an opinion as to whether Petitioner met the standard for competence at the time of trial.

The Court is not persuaded that the evidence submitted by Petitioner is the clear and convincing proof required for this Court to disregard the state court's findings. Accordingly, Respondent is entitled to summary judgment on this claim.

*Paragraph 7: Cross Examination of Bennie Clay*

In Paragraph 7, Petitioner argues that the trial court's denial of his right to cross examine Bennie Clay about his then-pending drug charges violated his Sixth, Eighth and Fourteenth Amendment Rights. Respondent argues that Petitioner failed to allege the Eighth Amendment as a basis for this claim in state court, and that aspect of his claim is defaulted. As to the exhausted portion of the claim, Respondent contends that the decision of the state court on direct appeal was correct.

The Court is persuaded that Petitioner adequately raised this claim in state court.

On direct appeal, the court discussed this issue as follows:

The Defendant alleges that the trial court erred in not allowing defense counsel to cross-examine a prosecution witness concerning a pending felony indictment against him. Defendant unsuccessfully sought to impeach prosecution witness Bennie Clay by examining him about an indictment pending in Davidson County Criminal Court charging him with possession of cocaine for resale and possession of a firearm during the commission of a felony. Clay had been arrested on these charges in August 1988, several months after his wife and daughters were killed and the bullet had been removed from his shoulder.

The Defendant asserts that the evidence of the pending indictment was admissible to impeach the witness by showing bias. Relying on the case of *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the trial court held that 'under the unique fact situation in this case' where the witness's prior statements to police were consistent with his testimony and were made long prior to his arrest, there was no argument that the pending charge could have affected his testimony and the evidence of the indictment was only 'marginally relevant' and would have confused the case.

Defendant argues that failure to allow introduction of the pending charges violated his right to confrontation under the Sixth Amendment of the U.S. Constitution and Article I, Section 9, of the Tennessee Constitution. '[A] criminal defendant states a violation of the [federal] Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate crossexamination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses.' *Delaware v. Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436; *see also Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988). The defendant must show that a reasonable jury might have received a significantly different impression of the witness's credibility had counsel been permitted to pursue his proposed line of cross-examination. *Delaware v. Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436. Such an improper denial of the right to confrontation is subject to harmless error analysis. *Id.*, 475 U.S. at 681, 106 S.Ct. at 1438.

Because of the 'marginal relevance,' of this issue and the obvious bias of the witness against the Defendant, if the trial court erred in restricting cross-examination on this point, any error was harmless beyond a reasonable doubt. *See State v. Taylor*, 668 S.W.2d 681, 683–684 (Tenn.Crim.App.1984).

815 S.W.2d at 177.

Petitioner argues that the trial court's decision that the limited cross examination did not violate the Confrontation Clause was contrary to clearly established law, relying on *Davis v. Alaska*, 415 U.S. 308, 317, 320, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), *VanArsdall, supra, In re Murchison*, 349 U.S. 133, 139, 75 S.Ct. 623, 99 L.Ed. 942 (1955), *United States v. Havens*, 446 U.S. 620, 626, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980), *Olden v. Kentucky, supra*, and various other circuit court cases.

Petitioner also challenges the Tennessee Supreme Court's conclusion that any error by the trial court in that regard was harmless as an improper application of harmless error analysis. This Court disagrees, and

in any event, determines that Petitioner is not entitled to habeas relief on this claim.

Initially, the Court must determine the appropriate standard for a habeas court to apply in reviewing a state court's harmless error analysis. The state court applied harmless error analysis from prior case law that was rooted in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Chapman* requires that the reviewing court find that an error was harmless beyond a reasonable doubt. For purposes of habeas review, however, the Supreme Court has held that federal courts should apply the harmless error standard set out in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 1721–22, 123 L.Ed.2d 353 (1993), to make an independent determination of whether constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." Subsequent to *Brecht,* Congress enacted the AEDPA, which appears to require that federal courts review a state court's harmless error decision only to determine if it is "contrary to or an unreasonable application" of *Chapman.*

■ The Sixth Circuit has resolved any questions in this regard by requiring application of *Brecht* on collateral review. *See Nevers v. Killinger,* 169 F.3d 352, 371–72 (1999), *abrogated on other grounds, Williams v. Taylor, supra* ("If the petitioner is able to make that showing, he will surely have demonstrated that the state court's finding that the error was harmless beyond a reasonable doubt—the *Chapman* standard—was outside the realm of plausible credible outcomes, and therefore re-

sulted from an unreasonable application of *Chapman.*"); *Bulls v. Jones,* 274 F.3d 329 (6th Cir.2001). Accordingly, the Court will apply the *Brecht* standard, one less onerous than *Chapman,* to determine whether the trial court's limitation on the Bennie Clay cross examination had a substantial and injurious effect or influence in determining the jury's verdict or that it resulted in actual prejudice. *Brecht,* 113 S.Ct. at 1722.[2]

■ For the reasons pointed out by the Tennessee Supreme Court, this Court concludes that Petitioner has not made such a showing. The indictment against Clay was issued long after he made statements to the police regarding his relationship with the victims and with the Petitioner, and those statements were consistent with his testimony at trial. Furthermore, the direct and cross examination of Clay revealed his bias against the Petitioner, as he testified to his belief that the Petitioner was impeding his attempts to reconcile with Angela Clay, and that Petitioner had assaulted him some time prior to the murders. (Addendum 3, at 1521, 1590–91, 1599). In light of the record as a whole, the Court is not persuaded that preventing disclosure of the pending indictment to the jury[3] resulted in actual prejudice to the Petitioner under *Brecht* either as to his conviction or his sentence.

*Paragraph 8: Actual Innocence*

Paragraph 8 of the Amended Petition alleges that Petitioner's conviction and sentence violate the Eighth and Four-

---

**2.** Even if the Court applies the AEDPA standard, however, for the reasons set forth below, the Court is not persuaded that the Tennessee Supreme Court unreasonably applied *Chapman* or unreasonably determined the facts in finding that any error by the trial court was harmless beyond a reasonable doubt.

**3.** Despite Petitioner's contention, the state court did not hold that Clay's testimony was of "marginal relevance," it determined that evidence concerning the indictment was of "marginal relevance."

teenth Amendments because he is actually innocent of first degree murder and of the death sentence. Respondent argues that Petitioner has failed to state a cognizable claim for habeas relief.

■ In *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the Supreme Court assumed, without deciding, that in a capital case a "truly persuasive demonstration of actual innocence" made after trial would render the execution of a defendant unconstitutional and warrant habeas relief if there were no state avenue open to process such a claim. 113 S.Ct. at 869. The Court also noted, however, that claims of actual innocence based on newly discovered evidence have never been held to state a claim for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. 113 S.Ct. at 860. *See also Lefever v. Money,* 225 F.3d 659 (Table), 2000 WL 977305 (6th Cir. July 6, 2000)("We also reject defendant's suggestion that her case falls within the *purported 'Herrera* exception,' even though she claims to have made a truly persuasive showing of her innocence... *Assuming that such an exception exists* in this context, we conclude that defendant's 'newly discovered evidence' is not compelling evidence of her innocence...")(emphasis added); *Harris v. Borgert,* 12 F.3d 212 (Table), 1993 WL 477008, at * 2 (6th Cir. Nov.18, 1993).

Petitioner has not shown that he is entitled to relief based on *Herrera,* and the Court grants summary judgment to Respondent on this claim.

*Paragraph 9: Withheld Exculpatory Evidence*

In Paragraph 9, Petitioner alleges that, in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, the prosecution withheld the following exculpatory evidence: (1) ballistics evidence showing that he did not shoot the victims; (2) T.B.I. lab exhibit 8 and the results of the examination of that item; (3) evidence showing that Bennie Clay owned a large caliber weapon and was to receive insurance proceeds following the homicides;[4] (4) evidence indicating that someone other than Petitioner committed the homicides; and (5) physical evidence recovered at the scene that was neither tested nor preserved. In response to the summary judgment motion, Petitioner pursues only the allegation regarding the life insurance evidence, and dismisses the portion of this claim related to the withholding of evidence concerning forensic firearms examination.

Respondent argues that Petitioner has failed to specifically identify the evidence alleged to have been withheld, and that, in any event, this claim is procedurally defaulted because it was not raised in state court. In response to the default argument, Petitioner argues, relying on *Rickman v. Dutton,* 864 F.Supp. 686, 706 (M.D.Tenn.1994), that there can be no legitimate procedural default of false testimony claims because enforcement of the default would reward the State for engaging in deceptive activities. Even if the Court accepts that *Rickman* states an appropriate basis for avoiding the procedural bar, the decision in *Rickman* is distin-

---

**4.** The evidence regarding insurance proceeds that Petitioner claims was withheld is a letter to the police department from Clay's employer's insurance company indicating that Clay had insurance policies on the victims and stood to benefit financially from their deaths. (Petitioner's Exhibit 41 (attached to Docket No. 72)). Petitioner has recently obtained information indicating that Clay received a total of $9,000 under those policies. (Petitioner's Exhibit 42).

guishable because the withheld evidence in that case demonstrated that a government witness had testified falsely at trial. *Id.* Petitioner has not suggested that the withheld material in this case demonstrates that a witness testified falsely. Therefore, the Court concludes that Petitioner has not shown cause for his procedural default under *Rickman.*

■■■■■ Alternatively, Petitioner argues that the withholding of *Brady* material can itself establish cause for a procedural default, citing *Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), and various circuit court decisions decided prior to *Strickler.* In *Strickler,* the Supreme Court held that a *Brady* claim may be raised for the first time in a federal habeas proceeding where support for the claim was not discovered during the state court proceedings. 119 S.Ct. at 1946–49. As the Respondent points out, however, the record indicates that Petitioner's post-conviction trial counsel had access to the insurance information as he asked trial counsel about it during the post-conviction hearing. (Addendum 14, at 159)("... were you aware as to whether the prosecution had ever provided you with a copy of a letter from the—from Mr. Clay's employer, an insurance company, about the proceeds of life insurance on Ms. Clay and the two children?") Petitioner does not suggest that he pursued this claim during the post-conviction proceedings, nor does he suggest that case law supports a finding of cause under these circumstances. Therefore, the Court concludes that Petitioner has not shown cause for avoiding the procedural bar under *Strickler,* and Respondent is entitled to summary judgment on this claim.[5]

*Paragraph 10: Sufficiency of the Convicting Evidence*

In Paragraph 10 of the Amended Petition, Petitioner argues that the evidence introduced at trial was insufficient to support his convictions. Respondent argues that the portion of this claim that focuses on the failure to prove the elements of premeditation and deliberation was not raised in state court, and is procedurally defaulted. In addition, Respondent argues that to the extent Petitioner relies on the state law sufficiency standard, he has failed to state a cognizable claim for habeas relief. To the extent Petitioner relies on federal law, Respondent argues, his argument was correctly rejected by the Tennessee Supreme Court on direct appeal.

The Court is persuaded that this claim was adequately raised before the state court, and that the state court applied the federal sufficiency standard, set forth in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in determining whether the evidence supported Petitioner's convictions under state law, as that law has been interpreted by the state courts.

The Tennessee Supreme Court addressed the sufficiency issue as follows:

The Defendant next challenges the sufficiency of the convicting evidence. He contends that the trial court erred in overruling his motion for a judgment of acquittal as to all counts of the indictment. He avers that the evidence presented at trial was insufficient to convince any rational trier of fact that he

---

**5.** Even if the Court were to disregard the procedural bar, it is not persuaded that there is a reasonable probability that the results of the trial would have been different if the jury had been told that Clay would receive a total of $9,000 as a result of the victim's deaths, given the nature of the other evidence of Petitioner's guilt. *Strickler,* 119 S.Ct. at 1952–55; *Coleman v. Mitchell,* 244 F.3d at 541–42.

was guilty of the offenses charged beyond a reasonable doubt. Rule 13(e), T.R.A.P.

The Defendant submits that there were no eyewitnesses to the offenses for which he was convicted and that the proof against him consists entirely of circumstantial evidence. He further contends that it is reasonable to believe that, at the time of the murders, some person other than himself had possession of the gun with which he shot Bennie Clay in 1986. The State responds that the body of evidence, although circumstantial in nature, unerringly pointed the finger of guilt to the Defendant and effectively excluded every other theory or hypothesis except that of Defendant's guilt.

The principles which govern our review of a conviction by jury are well settled. A jury verdict approved by the trial judge credits the testimony of the witnesses for the State and resolves all conflict in favor of the State's theory. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn.1983); *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn.1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). A verdict against the Defendant removes the presumption of innocence and raises a presumption of guilt on appeal, *State v. Grace*, 493 S.W.2d 474, 476 (Tenn.1973), which the Defendant has the burden of overcoming. *State v. Brown*, 551 S.W.2d 329, 331 (Tenn.1977). Where the sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Rule 13(e), T.R.A.P. Moreover, a conviction may be based entirely on circumstantial evidence where the facts are 'so clearly interwoven and connected that the finger of guilt is pointed unerringly at the Defendant and the Defendant alone.' *State v. Duncan*, 698 S.W.2d 63 (Tenn.1985); *State v. Williams*, 657 S.W.2d 405 (Tenn.1983); *State v. Crawford*, 225 Tenn. 478, 484, 470 S.W.2d 610, 612 (1971).

The Defendant was with the victims the evening they were murdered. He had been fighting with Angela Clay just a few days before the killings. The Defendant had previously threatened to kill Angela. The evidence established that the Defendant's fingerprints were on two telephones that were thrown on the floor of the victims' apartment. No other fingerprints were found on the telephones. The .44 caliber bullet recovered from Latoya's pillow, the .44 caliber bullet taken from Lakeisha's body, a bullet fragment from the automobile driven by Bennie Clay the day the Defendant shot him, and the .44 caliber bullet removed from Bennie Clay's body had all been fired from the same weapon the Defendant used to shoot Bennie Clay. The Defendant gave inconsistent statements regarding the location of the weapon, telling one person he had sold the gun and telling the police that he had thrown the gun into the Cumberland River. Defendant also gave inconsistent statements regarding his whereabouts the evening of the murders. He first told authorities of an alibi and did not mention entering the victims' apartment. In a second statement, he admitted entering the apartment and seeing the bodies of the victims. He described the victims, asleep and under the bed-

covers, just as the murderer would have seen them when he killed them, and not as one who had come upon the scene after they were dead would have seen them—one victim on the floor, and one partially off her bed. The defendant's statements were damaging. He stated that after finding the bodies of his girlfriend and her children, he left the apartment, locked the door, and, without reporting the shootings, returned to his mother's home, where he tried to get some sleep. His excuse for this unusual behavior—he didn't want to get involved.

Based upon the foregoing circumstantial evidence, we have no hesitancy in holding that the evidence against the Defendant Black was sufficient to support the three first degree murder convictions beyond a reasonable doubt. The evidence does not preponderate in favor of his innocence and against his guilt.

815 S.W.2d at 175–76.

■■■ Although the court did not mention the issues of premeditation and deliberation directly, the court relied on evidence supporting those elements in determining that the evidence was sufficient to support Petitioner's convictions for first degree murder. Specifically, the court noted that the Petitioner had been fighting with Angela Clay a few days before the killings, and that he had previously threatened to kill Angela. The court also noted in this excerpt, and in describing the facts, that the victims were all in bed, possibly asleep, at the time of the murders, suggesting an absence of passion in committing the murders.

Although the Petitioner argues that the Tennessee Supreme Court, subsequent to deciding Petitioner's case, has refined the definitions of premeditation and delibera-

tion, the Court is not persuaded that the decision by the Tennessee Supreme Court in this case was contrary to the reasoning of those cases. As Petitioner has not shown that the decision of the Tennessee Supreme Court was contrary to, or involved an unreasonable application of clearly established federal law, Respondent is granted summary judgment on Petitioner's claim in Paragraph 10.

*Paragraphs 11, 12 and 13: Ineffective Assistance of Counsel*

In Paragraphs 11, 12 and 13, Petitioner alleges that trial counsel provided ineffective assistance at trial and on appeal, in violation of the Sixth, Eighth, and Fourteenth Amendments. Petitioner alleges that trial counsel was ineffective for failing to: investigate evidence regarding Bennie Clay's motive and opportunity to commit the offenses (¶ 11(a)(1)); fully investigate the forensic evidence (¶ 11(a)(2)); fully investigate Petitioner's mental state (¶ 11(a)(3)); investigate a possible insanity defense (¶ (a)(4)); timely and properly investigate and present all evidence showing Petitioner incompetent to stand trial (¶ 11(b)); timely request, obtain and/or effectively utilize expert and investigative services (¶ 11(c)); consult with Petitioner during crucial stages and ensure his understanding (¶ 11(d)); adequately advise Petitioner about his right to testify (¶ 11(e)); develop reasonable trial strategy (¶ 11(f)); object to the trial judge's statements defining mitigation (¶ 11(g)); adequately question prospective jurors (¶ 11(h)); file pretrial motions regarding the state's evidence (¶ 11(i)); file pretrial motions challenging use of Petitioner's prior conviction (¶ 11(j)); investigate and present all evidence supporting a claim of innocence of premeditated murder (¶ 11(k)); adequately cross examine adverse witnesses (¶ 11(*l*)); object to the prosecutor's prejudicial statements

(¶ 11(m)); investigate, present, and argue all mitigating factors (¶ 11(n)); request a jury instruction on the use of prior inconsistent statements or regarding mental impairment as a mitigating circumstance (¶ 11(o)); request all appropriate instructions regarding mitigating circumstances and to object to the trial judge's definition of mitigating evidence (¶ 11(p)); raise important issues on direct appeal, including prosecutorial misconduct and the constitutionality of the Tennessee death penalty statute (¶ 11(q)); adequately investigate evidence of a possible alibi defense (¶ 11(r)); suppress statements the Petitioner gave the police based on mental disturbance and ineffective assistance of attorney Robert Skinner (¶ 11(s)); call Palmer Singleton to testify at the competency hearing (¶ 11(t)); object to Bennie Clay's trial testimony regarding the assault by Petitioner (¶ 11(u)); demonstrate that Petitioner was mentally retarded (¶ 11(v)); engage in plea negotiations (¶ 11(w)); subpoena Dr. Kenneth Anchor to testify about Petitioner's mental state at the guilty and penalty phases (¶ 11(x)); fully investigate and present mitigating factors about Petitioner's character and background (¶ 12(a)); conduct a complete social history investigation of Petitioner (¶ 12(b)); and raise any and all issues presented in the petition on direct appeal (¶ 13).

Respondent argues that Petitioner failed to raise in state court the claims set out in subparagraphs (a)(1), (a)(2), (d), (e), (h), (j), (k), (o), and only partially raised the claims set forth in subparagraphs (a)(3), (a)(4), (b), (i), (p), (q), (s), (v). Thus, according to the Respondent, these claims are procedurally defaulted. Respondent points out that Petitioner did raise the claims set forth in subparagraphs (f), (g), (m), (r), (t), (u), (w), and (x), but contends that those claims were properly rejected by the Tennessee Court of Criminal Appeals.

Petitioner argues that he can establish cause and prejudice for his failure to raise any of the claims not raised in state court. First, Petitioner contends that he was not provided an adequate opportunity to investigate and present his claims because the post-conviction trial court denied his request for a continuance. The record indicates that the post-conviction trial court had agreed to hear evidence at two different hearings; the second hearing would be devoted to testimony by the psychiatric experts offered by Petitioner and the State. (Addendum 14, Vol. 5, 4–33). Post-conviction counsel requested a continuance of the first hearing so that he could call certain non-expert witnesses at the second hearing rather than the first hearing. *Id.* The trial court denied that request. *Id.*

Petitioner made a similar argument in his post-conviction appeal, and after extensive review of the trial court proceedings, the court found that "the petitioner was granted substantial time and money to pursue his post-conviction petition, and nothing in the record preponderates against the trial court's finding in this respect." 1999 WL 195299, at *25.

Even if the Court assumes that the inadequacy of a state post-conviction process can constitute "cause," the Court's review of the record of the post-conviction proceedings does not indicate that Petitioner was denied a full and fair post-conviction hearing. More specifically, the Court is not persuaded that the trial court's denial of a continuance establishes cause for any procedural default here.

Second, Petitioner contends that he was entitled to effective assistance of post-conviction counsel because he could only raise ineffectiveness claims for the first time in post-conviction proceedings. As there is no constitutional right to effec-

tive post-conviction counsel, the Supreme Court has not recognized the ineffectiveness of that counsel as constituting cause for a procedural default. *Coleman v. Thompson,* 111 S.Ct. at 2566–67; *Riggins v. Turner,* 110 F.3d 64 (Table), 1997 WL 144214, at *2 (6th Cir. March 27, 1997); *Thompson v. Rone,* 16 F.3d 1221 (Table), 1994 WL 36864, at *4 (6th Cir. Feb.8, 1994); *Mackall v. Angelone,* 131 F.3d 442, 448–49 (4th Cir.1997); 28 U.S.C. § 2254(i).

■ Finally, Petitioner argues that denial of relief on his claims would result in a miscarriage of justice under *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 865–67, 130 L.Ed.2d 808 (1995). Under *Schlup,* a petitioner may avoid a procedural default bar by showing that a constitutional violation has probably resulted in the conviction of one who is actually innocent. To establish the requisite probability, the petitioner must show that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." 115 S.Ct. at 867. The Court is not persuaded that Petitioner has met this standard in this case.[6]

Accordingly, Petitioner has failed to demonstrate cause for his procedural default, and Respondent is entitled to summary judgment on those claims that were not presented to the state courts.[7]

As for the exhausted claims, the Tennessee Court of Criminal Appeals addressed Petitioner's ineffective assistance of counsel arguments as follows:

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

In order for the petitioner to be granted relief on the ground of ineffective assistance of counsel, he must establish that the advice given or the services rendered were not within the range of competence demanded of attorneys in criminal cases and that, but for his counsel's deficient performance, the result of his trial would likely have been different. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Rose,* 523 S.W.2d 930 (Tenn. 1975). Furthermore, we may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn.1982). Trial counsel may not be deemed ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State,* 599 S.W.2d 276 (Tenn.Crim.App.1980). The reviewing courts must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066.

### A. Presentation of Alibi

The petitioner claims his counsel were ineffective for failing to investigate the

---

**6.** Petitioner also argues that he has established cause for the claim in subparagraph 11(a)(2) regarding counsel's failure to investigate the ballistics evidence. Petitioner argues that cause is established because he was not allowed access to certain physical evidence and was not allowed to depose the prosecution's experts in state court. Petitioner cites *Strickler v. Greene, supra,* to support his argument. Even if the Court accepts Petitioner's argument that he was unable to obtain these materials in state court, which the Respondent denies, the *Strickler* decision does not support a finding of cause here as the materials in *Strickler* qualified as *Brady* material. Petitioner does not claim that these items were *Brady* material.

**7.** Those claims, as set forth above, are those set out in subparagraphs (a)(1), (a)(2), (d), (e), (h), (j), (k), (o), and those portions of subparagraphs (a)(3), (a)(4), (b), (c), (i), (p), (q), (s), (v), 12 and 13 that were not presented to the state courts.

alibi defense thoroughly. He asserts that further investigation would have revealed the futility of this defense, and he argues that more suitable defenses could have been advanced.

The petitioner states that trial counsel failed to substantiate the petitioner's story by not interviewing Ms. Walden or her house guests from the night of the murder. Counsel for the petitioner and the state attack each other's interpretation of the evidence in this respect. The petitioner argues that defense counsel would have discovered that the petitioner did not visit Ms. Walden after 10:00 p.m. the night of the murder, as he claimed, if they had merely talked to her and her house guests before trial. The state contends that there is nothing in the record to suggest that counsel did not interview these witnesses. The petitioner also contends that counsel's shortcomings regarding these witnesses not only destroyed the alibi defense but affected the petitioner's credibility during sentencing. At the evidentiary hearing, counsel testified that he believed Ms. Walden probably was interviewed prior to trial, but that he did not know specifically. Furthermore, although Ms. Walden initially testified that she spoke to no one before taking the witness stand, she later testified that she was uncertain whether she talked to counsel. At any rate, defense counsel specifically testified that the investigator assigned to this case would have been responsible for interviewing Ms. Walden prior to trial. Counsel also testified that this investigator was still employed with the public defender's office. Although the parties differ regarding the significance of the evidence presented, we believe that the petitioner failed to elicit this information from an apparently available witness, the investigator. *See Black v.*

*State*, 794 S.W.2d 752, 757 (Tenn.Crim. App.1990).

The petitioner also argues that counsel's failure to discover that the petitioner's mother previously gave the police a contradictory statement significantly hampered their defense. However, the petitioner has not proven by a preponderance of the evidence that defense counsel inadequately prepared this witness. Counsel testified at the evidentiary hearing that they were unaware of this tape-recorded statement until after the witness testified at trial. The trial transcript suggests counsel were surprised by this testimony. Moreover, this witness testified that she did not tell defense counsel that she had been recorded. Counsel testified that they did not knowingly place perjured testimony before the jury. The petitioner has failed to show that counsel were deficient in this respect. As the state suggests, counsel cannot be held responsible for the witness's failure to reveal relevant information. Counsel testified that they met with the petitioner's family several times before trial. Contrary to the petitioner's claim, there is nothing in the record to indicate counsel failed to 'gain [their] trust and secure information from [them].'

The petitioner argues that because his counsel failed to investigate the alibi defense adequately, they lost the opportunity to present alternative defenses. He suggests that attacking the state's evidence in terms of establishing a reasonable doubt or even advancing an admission-based defense would have been superior to the alibi defense. Regarding the admission-based defense, the petitioner claims that counsel could have negated the requisite mens rea for first degree murder if they had adequately explored the petitioner's mental condition. As for a reasonable doubt de-

fense, defense counsel testified at the evidentiary hearing that they did attempt to portray the victim's estranged husband as a suspect and show that the victim was obsessed with the petitioner. As for an admission-based defense, aside from the fact that the petitioner denied committing the crimes, there is essentially no evidence that the petitioner was rendered incapable of forming the mental state required for first degree murder.

Counsel admitted the difficulties in pursuing a somewhat weak alibi defense, but they testified that they felt locked into this strategy because of the petitioner's wishes. *Cf. Oscar Franklin Smith v. State*, No. 01C01–9702–CR00048, [1998 WL 345353] Davidson County (Tenn.Crim.App., June 30, 1998) (holding that although counsel pursued an alibi defense as requested by the defendant, despite the fact that counsel was not confident in the defense, counsel was not ineffective). The failure of a particular defense does not equate to ineffective assistance. *See Williams v. State*, 599 S.W.2d 276, 279–80 (Tenn. Crim.App.1980). This court must presume counsel acted reasonably, and it cannot review counsel's decisions solely through the benefit of hindsight. *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). At the evidentiary hearing, Mr. Alderman testified that he believed that the defense team had sufficient time to prepare for trial under the circumstances. Despite the petitioner's claims regarding counsel's investigation, given the convicting evidence, he has failed to show how the outcome of the trial would have changed. Nothing regarding the circumstances surrounding the petitioner's presence at Ms. Walden's or his mother's residence can refute the ballistic or fingerprint evidence or the content of his statement to the police.

The same applies to the petitioner's argument that counsel's failure to investigate fully the petitioner's activities on the Saturday before the murders prejudiced his defense. The petitioner had stated that he cleaned the victim's car and that they were friendly to one another. At the post-conviction hearing, the petitioner elicited from his former employer the fact that the petitioner cleaned a car that Saturday and that there appeared to be no animosity between the petitioner and the woman in the car. We note that the witness could not remember the make of the car or identify the woman, stating only that she was African–American. However, our review of the record does not lead us to conclude that this testimony would have had any bearing on the outcome.

B. Investigation of Mental Health Issue

The petitioner claims that counsel's failure to investigate and develop fully the petitioner's social history and alleged mental defect represents the ineffective assistance of counsel. Specifically, the petitioner contends that the inadequate social history negatively affected the competency and sufficiency issues, as well as his ability to present mitigating evidence.

Initially, we note that the issue of the petitioner's competency to stand trial was determined by the Tennessee Supreme Court on direct appeal. *Black*, 815 S.W.2d at 173–74. Also, we note that the convicting court accepted the opinion of its own expert, as well as the state's, in deciding that the petitioner was competent to stand trial, despite the conflicting opinion of the defense expert. It is highly unlikely that a more detailed social history would have altered that court's finding. This is evident from the testimony of the petitioner's post-convic-

tion experts that the petitioner understood the various roles of the courtroom players, which is contrary to the trial expert's opinion.

First, we do not believe that the petitioner proved that his trial counsel performed deficiently in investigating and developing evidence regarding the petitioner's mental condition. Although trial counsel testified that they would now be better equipped to investigate a capital defendant's background for mitigation purposes, counsel testified that they interviewed the petitioner, his family, and his acquaintances. Counsel also testified that it was their understanding that mental health experts gathered their own social histories to use for their evaluations. In fact, the experts used by the petitioner at the post-conviction hearing testified that normally they would obtain their own social history. Dr. Bernet testified that in complex cases, he would rely on counsel for additional information, but he also stated that it was usually the expert who would make the request. Trial counsel in this case testified that their expert did not request any further background information. Moreover, counsel testified that none of their own interviews disclosed any relevant information concerning the petitioner's mental health. Counsel's performance in this case did not fall below that which is required. The petitioner did not offer testimony at the evidentiary hearing from the trial expert regarding the need for a more detailed social history. Moreover, merely because counsel failed to discover indications of partial amnesia does not mean that they were ineffective. The attorneys are not guarantors of the validity of an expert's results. In any event, the petitioner's trial expert did not believe the petitioner was competent, yet the convicting court twice rejected the petitioner's claim.

The petitioner insisted upon pursuing an alibi defense. Neither the petitioner nor his family could provide counsel with any information relative to the petitioner's mental health history. Despite this, counsel presented eight character witnesses along with the testimony of Ms. Jaros. Although Dr. Anchor did not testify, Ms. Jaros was able to convey the substance of Dr. Anchor's evaluation. Ms. Jaros testified at trial that she thought they had a pretty good impression of the petitioner based upon the information they had. In fact, she informed the jury that the petitioner had 'these ideas which are falsely held beliefs that might influence his actions in some way. . . . He does not seem to have a conscious recollection of what happened in March [the time of the murders].' She indicated that the petitioner exhibited delusional traits. Thus, counsel did pursue and present evidence regarding the petitioner's mental condition. We believe counsel were not deficient with respect to the petitioner's mental condition issues.

Also, we do not believe that the petitioner has shown prejudice. In *Goad v. State*, 938 S.W.2d 363, 371 (Tenn.1996), our supreme court listed several factors for courts to consider when examining resulting prejudice in the sentencing phase of a capital trial: the nature and extent of mitigating evidence that was available but not presented, whether substantially similar mitigating evidence was presented, and the effective strength of the aggravators. In the present case, the expert evidence proffered at the post-conviction hearing was similar to that presented to the jury during sentencing. Moreover, given the quality and quantity of the existing aggravating circumstances (T.C.A. § 39–2–

203(I)(1), (2), (5), (6), (7), (12) (1982)), we do not believe that such evidence could have altered the verdict.

The trial court in the present case found as follows:

The Court rejects the petitioner's conclusions. First, the petitioner suggests that his trial lawyers somehow failed him because they did not convince the trial court that he was incompetent. Furthermore, the contention now is that somehow the lack of a more detailed social history was the primary failing of defense counsel.

It is true that the petitioner's present counsel found a psychiatrist and psychologist who now say that the petitioner may not have been competent when he stood trial in 1989. It is certainly not the test of ineffective assistance of counsel that trial counsel did not find an expert to say what petitioner would have liked him/her to say. *See Poyner v. Murray*, 964 F.2d 1404, 1418–19 (4th Cir.1992) (counsel not ineffective for failure to find a psychiatrist that agrees with a certain diagnosis). Trial counsel hired an independent psychologist and psychological examiner. These hired experts did an evaluation of the petitioner which included a social history[,] they reached their own conclusions, and the psychologist testified at a competency hearing and gave the trial judge his best opinion. That opinion was at least sufficient to cause the trial judge to appoint a psychiatrist to do an additional evaluation. The fact that the trial court ultimately made, and the Supreme Court of Tennessee affirmed, a finding that the petitioner was competent to stand trial was not the result of the failings of defense counsel.

The petitioner also seems to suggest that perhaps trial counsel should have tried an insanity defense or at least put on more evidence of the petitioner's 'social history' and serious mental illness. The petitioner overlooks the testimony of Pat Jaros before the jury. She was able to not only give her own portrait of the petitioner's mental health, but essentially she repeated Dr. Anchor[']s analysis. Both Dr. Anchor and Ms. Jaros found no support for an insanity defense. Even petitioner's present experts did not testify that he had an insanity defense.

The petitioner's present counsel emphasizes and reemphasizes the failure of trial counsel to provide its expert witnesses with an adequate social history. The argument seems to be that if an adequate social history had been provided then the experts testifying in 1989 would have reached a different conclusion supportive of petitioner's present contention that he was not competent to stand trial and had either an insanity defense or serious mental illness that would have mitigated sentencing. The petitioner says that the social history is the responsibility of defense counsel. The Court notes that both Dr. Anchor and the court appointed evaluators from the local community health center had their own social histories prepared. These histories were relied upon in reaching their opinions. The Court believes that it is more a function of the mental health profession to determine the social history needed than it is the function of the defense lawyers. At the post-conviction hearing, neither Dr. Anchor nor Ms. Jaros testified at all, no less testified that the social history provided them was inadequate or that their opinions would have

changed if provided with a 'better social history.'

Even assuming that trial counsel could have painted the petitioner as more severely disturbed than they did, it remains to be seen how this could have possibly affected the outcome of the trial. The petitioner was found to have six (6) aggravating circumstances including a prior crime of violence, and including his killing of two (2) children. If trial counsel might have submitted more and stronger evidence to the jury about the petitioner's mental health background and history this error was not prejudicial. This case is far from one in which defense counsel offered no mitigating evidence. *See Adkins v. State*, 911 S.W.2d 334, 354–57 (Tenn. Crim.App.1995). The Court concludes that if there was error at the trial such error was not of a nature that it could have affected the jury's determination given the strong evidence supporting the six (6) aggravating factors found by the jury.

We conclude that the trial court ruled correctly and that the petitioner has failed to show how the proof preponderates against the trial court's findings.

As a collateral argument, the petitioner contends that the ineffective assistance of Robert Skinner, the attorney who first met with the petitioner at the police station, adds to his present claim of ineffective assistance of counsel. As the petitioner acknowledges, however, the supreme court already determined on direct appeal that Mr. Skinner's representation was not ineffective. *Black*, 815 S.W.2d at 184–85 (Tenn.1991). Therefore, this issue has been previously determined under the applicable post-conviction statute. T.C.A. § 40–30–112(a) (repealed 1995); *see House v. State*, 911 S.W.2d 705, 711 (Tenn.1995).

## C. Argument of Prosecutor

Next, the petitioner claims that counsel were ineffective for failing to object to the following statements made by the prosecutor during closing arguments:

And what I'm telling you, ladies and gentlemen, is this, we're asking for the death penalty for all three of these deaths. But you know what, if you don't give him the death penalty for those two little girls, for what he did to them—and I submit to you, based upon the facts and common sense, that you reward him.... When that man opened the door to that apartment and walked in there, and he walked through that house, and he walked back to that bedroom, and he took that great big old gun and he killed Angela Clay, as soon as he pulled that trigger, he had a life sentence because he committed murder in the first degree. As soon as he pulled that trigger, at a minimum, he had a life sentence. What he did then was to kill the witnesses, when he killed the two little girls. He took a chance. If I kill them, there are no witnesses, and I may not get caught. And if he doesn't get any more than life, then he's gotten away with it. You've rewarded him for it. He's killed the witnesses to the case, two children, for no reason, and he's going to serve a life anyway he says when he's standing there and he kills her. Why not do the witnesses in? Why not go ahead, just go ahead and just do them in? Ladies and gentlemen, if you don't give him the chair on that, then you've rewarded him.

The petitioner also argues that it was ineffective for counsel not to raise the issue on direct appeal. In support of his argument, the petitioner relies upon

*State v. Smith*, 755 S.W.2d 757 (Tenn. 1988), and *State v. Bigbee*, 885 S.W.2d 797 (Tenn.1994). As the post-conviction court found, however, these cases are distinguishable from the present situation. In *Smith* and *Bigbee*, the defendants had previously received life sentences for unrelated murders. The court found prejudicial prosecution arguments informing the jury of the previous life sentences and stating that the jury would, in essence, reward the defendants by not imposing the death penalty for the subsequent murders. In the present case, the petitioner was facing the death penalty in the same trial for three related killings. Accordingly, as the post-conviction court noted, the jury could not help but have full knowledge of all three sentences it was considering for the three murders. Thus, the concern expressed by the court in *Smith* and *Bigbee* that the jury should not base its decision on unrelated sentences is not present in this case.

Trial counsel acknowledged at the evidentiary hearing that the above-quoted argument was improper. Although they did not proffer a reasonable explanation for not voicing an objection, counsel stated that they did not raise the issue on appeal because they considered it to be waived. The state argues that counsel's failure to object to the argument was not improper. According to the state, the prosecutor's statements were made to support the aggravating circumstance that the murders of the children were 'committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution.' T.C.A. § 39–2–203(I)(6) (1982). The state argues that these statements merely persuaded the jury that great weight should be given to this particular aggravator.

The trial court found the following:

This Court is not prepared to say that the failure to object to this argument is ineffective assistance of counsel. The Court, however, need not decide that issue. If there was a mistake, it was not prejudicial. The jury here only imposed the death penalty on one of the murders and a life sentence on the other two. Secondly, in light of the jury's finding of six (6) aggravating circumstances, it is not possible to conclude that this error was prejudicial. *See State v. Walker*, 910 S.W.2d 381, 397 (Tenn.1995) (argument in death penalty case that imposition of a life sentence means for defendant that 'he wins again' was found not proper but not prejudicial).

We believe that the trial court made the proper finding. Even if counsel should have objected to the argument, it is unlikely that the objection would have had any effect on the jury's decision. The state was arguing for three death sentences. Moreover, in the statements, the state was talking about the killing of both children. However, the jury returned only one death sentence. This sentence was supported by six aggravating circumstances. The jury's verdict is supported by the evidence in the record. The petitioner has failed to show how the evidence preponderates against the lower court's finding in this respect.

D. Instruction on Parole Eligibility

The petitioner also contends that trial counsel were ineffective for failing to request the trial court to instruct the jury regarding parole eligibility. However, we note that our supreme court has concluded that there is no error in not giving such an instruction. *See State v. Bush*, 942 S.W.2d 489, 503–04 (Tenn.1997).

E. Voir Dire

The petitioner argues that trial counsel were ineffective for not objecting to the trial court's description of mitigating evidence during voir dire. In attempting to provide examples of mitigation, the judge mentioned 'serious mental disorder' and 'things favorable to the defendant.' As the state asserts, these statements were not instructions to the jury. In fact, the petitioner does not contest the instructions actually given to the jury before deliberation. The record reflects that the trial court properly instructed the jury according to the mandates of the law. The jury is presumed to follow the court's instructions. *See, e.g., State v. Blackmon,* 701 S.W.2d 228, 233 (Tenn.Crim.App.1985). No prejudice to the petitioner has been shown.

### F. Admission of Statements

The petitioner next contends that trial counsel should have further investigated the possible suppression of his statements to the police. Specifically, he argues that counsel should have considered whether the petitioner was competent to waive his right against self-incrimination. The admissibility of the statement provided in the presence of Mr. Skinner was addressed on direct appeal, *Black,* 815 S.W.2d at 184–85, and has, therefore, been previously determined. T.C.A. § 40–30–112(a) (1990). Although counsel challenged the admission of both recorded statements, the petitioner argues that their failure to raise the competency issue in this respect was fatal to his defense. However, as discussed above, counsel were not ineffective for failing to investigate the petitioner's mental health further. Moreover, the petitioner has failed to present any evidence that would support suppression of the statements.

Similarly, the petitioner contends counsel were ineffective for failing to seek redaction of portions of the petitioner's statements in which the prosecutor questioned whether the petitioner was lying. As the state notes, these isolated remarks by the prosecutor are found in a forty-three-page statement. Further, the prosecutor and detective were simply asking the petitioner why he was changing his story. The petitioner indicated that he was uncomfortable earlier talking with the detectives alone. Although the prosecutor used the word 'lie,' the petitioner was able to explain his position. Moreover, at one point, Mr. Skinner requested the prosecutor to retract her accusation. Accordingly, we cannot find any prejudice.

### G. Plea Negotiations

The petitioner claims that counsel were ineffective for failing to initiate plea negotiations with the prosecutor. Whether counsel were ineffective in this respect is irrelevant, because the petitioner has failed to show prejudice. Mr. McNally's testimony at the evidentiary hearing suggests that Mr. Alderman may have discussed this matter with the prosecution. However, the petitioner neglected to ask lead counsel whether he, in fact, had such discussions. The fact that Mr. McNally did not discuss the matter does not prove, by a preponderance of the evidence, that Mr. Alderman did not. Moreover, the prosecutor did not testify at the post-conviction hearing. Accordingly, the petitioner has not shown that the state would have accepted a plea. No prejudice has been shown.

### H. Expert Witness

The petitioner claims that counsel should have subpoenaed Dr. Anchor to testify at the sentencing phase and should have insisted on a better expert

witness to relay the mental health findings. Counsel testified at the evidentiary hearing that they chose the services of Dr. Anchor because they used him before, and he was one of a few experts they knew who was willing to handle criminal cases. Moreover, Mr. McNally testified that they chose a psychologist rather than a psychiatrist because it was his experience that psychologists communicated better to juries. Dr. Anchor testified at the competency hearing before trial and was the only expert associated with this case who believed the petitioner was incompetent. In addition to Dr. Anchor, the defense relied upon the services of Pat Jaros, a psychological examiner. Ms. Jaros and Dr. Anchor had a working relationship, and Ms. Jaros conducted the tests upon which Dr. Anchor relied for his evaluations.

Sometime before trial, counsel realized Dr. Anchor would be unavailable to testify due to a scheduling conflict. Counsel filed a motion to continue based upon this, but the court denied the motion. Although the court agreed to additional funds for another psychological expert, the defense decided to allow Ms. Jaros to testify instead. With the court unwilling to grant a continuance, counsel believed they did not have sufficient time to replace the work that had already been performed. And given the fact that Ms. Jaros worked with Dr. Anchor on this case, counsel believed that she could convey the crux of Dr. Anchor's findings. Counsel were concerned that Dr. Anchor would be hostile on the witness stand if they forced him away from his professional conference in Hawaii. The trial court allowed Ms. Jaros to testify as an expert witness, and she conveyed to the jury Dr. Anchor's evaluation concerning the petitioner's mental health.

Counsel's performance under these circumstances was not deficient. Counsel were able to locate an expert who believed the petitioner was incompetent. The trial court, however, ultimately disagreed with this opinion. We believe counsel made a reasonable trial decision. Although Dr. Anchor did not testify, the defense was able to present an expert witness who conveyed to the jury the essential findings of the expert evaluations.

I. Competency Hearing

The petitioner also claims that counsel were ineffective for failing to call Palmer Singleton, a trial attorney, to testify on behalf of the petitioner at the pretrial competency hearing. During the competency hearing, counsel offered Singleton's affidavit which stated, in effect, that he believed that the petitioner was unable to assist his attorneys. Mr. Singleton did not testify, however, and the trial court refused to consider his affidavit. Although Mr. Singleton did not testify, Mr. Alderman, an experienced attorney, testified at the hearing to the same effect. The petitioner argues that the testimony of Mr. Singleton may have produced a different result at the competency hearing. This argument does not satisfy his burden in this case. It is highly unlikely that the trial court would have been persuaded by cumulative testimony from another attorney in light of the expert opinions available, including the petitioner's own expert who believed the petitioner was not competent. The petitioner has not shown how the outcome of the hearing would have been different if Mr. Singleton had testified.

The petitioner also contends that counsel erred to his detriment in failing to introduce notes written by the petitioner during voir dire. The petitioner claims the notes would have rebutted some of the trial court's comments that

the petitioner was alert during voir dire, conferred with counsel, and even took notes. Contrary to the petitioner's description, the notes are not 'primarily meaningless doodles or ... relatively meaningless observations.' The notes contain what appears to be the petitioner's comments on each prospective juror (the last page of the eleven contains words from a prayer). Some examples are: 'putting words in the person's mouth,' 'he's a mason on the stand and the DA is a mason also,' 'the right age limit, she will work out good on this case,' 'He's a pretty good example. He will obey the law,' and 'he was very truthful by going by the law.' As the notes reflect, the petitioner actually noticed that one of the prosecutors was wearing the insignia pin for an organization in which one of the prospective jurors belonged. We believe that introduction of these notes would have done nothing more than support the trial court's conclusion. Counsel were not ineffective in this respect.

### J. Evidence of Prior Crime

Next, the petitioner claims ineffective assistance of counsel due to counsel's failure to object to the testimony of Bennie Clay detailing the facts surrounding the petitioner's guilty plea for shooting Clay. The record reflects that the trial judge conducted a conference in his chambers prior to the testimony of Clay. It also indicates that the trial court was going to allow Clay to testify about the incident but was not going to allow unnecessary detailed testimony of the circumstances. Clay's testimony apparently goes beyond describing the nature of the incident, as counsel voiced an objection after the testimony was solicited. Counsel also moved for a mistrial, but to no avail. The petitioner now alleges counsel erred to his prejudice.

While it is generally true that facts of a previous unrelated conviction are inadmissible in a later trial, it is also true that this type of evidence may be relevant to an issue on trial. *See, e.g., State v. Goad,* 707 S.W.2d 846, 850 (Tenn. 1986); *State v. McKay,* 680 S.W.2d 447, 452 (Tenn.1984). With the state proving that the same gun that was used to kill the victims in the case at hand was used by the petitioner to shoot Clay, certain facts of the petitioner's prior conviction were certainly relevant. The petitioner admitted to shooting Mr. Clay, and the bullets removed from Mr. Clay's body matched those removed from the victim's body in this case. Accordingly, the jury was well aware of the petitioner's actions toward Clay. Although Clay's portrayal of these events on the witness stand may have been somewhat colorful, counsel's failure to object at the time of the testimony did not result in the admission of testimony more detrimental than what would have been allowed otherwise. Prejudice has not been shown.

The petitioner claims counsel were overworked at the time of this case and could not adequately prepare and present the issues raised. Counsel, however, testified that they maintained a normal caseload at the time of this trial. Moreover, the trial court appointed the office of the public defender in compliance with the then existing legal standards. The petitioner has failed to show how counsel were ineffective or how any alleged errors on counsel's behalf prejudiced him. Accordingly, we hold that the evidence does not preponderate against the trial court's findings on this issue.

1999 WL 195299, at *13–22.

Petitioner argues that this Court should disregard the decision of the Court of Criminal Appeals because the state court

misstated the test for ineffectiveness under *Strickland.* According to the Petitioner, the court overstated the level of prejudice necessary for relief by requiring that the Petitioner show "but for his counsel's performance, the result of his trial would likely have been different." *Id.,* at *13. The proper standard, Petitioner contends, requires only that a petitioner establish a "reasonable probability that, but for counsel's unprofessional errors, the outcome would have been different." Essentially, Petitioner's position is that a "reasonable probability" is a lower standard than a "likelihood."

■ This Court is not persuaded that the state court's choice of words reflect either a misstatement of the law or a misapplication of the law to the facts. In discussing the *Strickland* prejudice standard, courts frequently use the term "likely" interchangeably with the phrase "reasonable probability." *See, e.g., Stanford v. Parker,* 266 F.3d 442, 455 (6th Cir. 2001)(". . . whether counsel's errors likely undermined the reliability of and confidence in the result."); *Cone v. Stegall,* 14 Fed.Appx. 439, 442–43 (6th Cir. June 29, 2001)(same); *United States v. Alsop,* 12 Fed.Appx. 253 (6th Cir. April 12, 2001)(same); *Skaggs v. Parker,* 235 F.3d 261, 270 (6th Cir.2000); *United States v. Walker,* 210 F.3d 373 (Table), 2000 WL 353518, at *5 (6th Cir. March 30, 2000)("As to the motion to sever, under *Strickland,* Walker must demonstrate that the outcome of his trial likely would have been different but for counsel's errors."); *West v. Seabold,* 73 F.3d 81, 84 (6th Cir.1996). *See also Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985)("For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea . . . [which] will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.") The state court's use of the word "likely" does not reflect application of a more exacting standard than used in *Strickland,* such as a "preponderance of the evidence" standard, a "more likely than not" standard, or an "absolute certainty" standard. The Court is persuaded that in using the term "likely," the state court focused on the same analysis as required by the "reasonable probability" standard—". . . an assessment of the likelihood of a result more favorable to the defendant." *Strickland,* 104 S.Ct. at 2068.

As the Court concludes that the state court's decision was not contrary to, nor an unreasonable application of, federal law, it may not grant habeas relief on the ineffective assistance claims addressed by the state court. Accordingly, Respondent is entitled to summary judgment on those claims addressed by the Court of Criminal Appeals as set forth above.[8]

*Paragraph 14: Execution of Mentally Retarded Person*

■ In Paragraph 14, Petitioner alleges that his execution violates the Eighth and Fourteenth Amendments because he is mentally retarded. Respondent contends that this claim is procedurally defaulted, and alternatively, under *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106

---

8. These claims are set forth in subparagraphs 11(f), (g), (m), (r), (t), (u), (w), (x), as well as subparagraphs 11(*l*) and (n). These claims also include those portions of subparagraphs (a)(3), (a)(4), (b), (c), (i), (p), (q), (s), (v), 12 and 13 that were addressed by the state court as set forth above.

L.Ed.2d 256 (1989), the claim is without merit.

In *Penry,* 109 S.Ct. at 2953–55, 2958, the Court held that the Eighth Amendment does not bar the execution of a mentally retarded person by virtue of his or her mental retardation alone. Although the Court has accepted certiorari in *Atkins v. Virginia,* — U.S. —, 122 S.Ct. 24, 150 L.Ed.2d 805 (2001), — U.S. —, 122 S.Ct. 29, 151 L.Ed.2d 8 (2001) to address this issue, this Court is bound by the holding in *Penry.*[9] Accordingly, Respondent is entitled to summary judgment on this issue.

*Paragraph 15: Heinous, Atrocious or Cruel Aggravator*

In Paragraph 15, Petitioner argues that the "heinous, atrocious or cruel" aggravator set forth in the death penalty statute is unconstitutionally vague. Respondent argues that he is entitled to summary judgment on this claim because the Tennessee Supreme Court correctly decided on direct appeal that the aggravator was not unconstitutionally vague under the Eighth and Fourteenth Amendments. To the extent that Petitioner seeks to raise a Sixth Amendment vagueness claim, Respondent contends, that claim is procedurally defaulted.

The Court is persuaded that Petitioner adequately raised this claim before the Tennessee Supreme Court on direct appeal, and the Tennessee Court of Criminal Appeals as part of the post conviction proceeding.

The Tennessee Supreme Court addressed this issue as follows:

The Defendant contends that the trial court erred in overruling his motion to dismiss the statutory aggravating cir-

cumstance enumerated in T.C.A. § 39–2–203(i)(5) because the statute is unconstitutionally vague. The jury found that the murder of Lakeisha Clay, Count Two, fell under the aggravating circumstance stated in T.C.A. § 39–2–203(i)(5) (1982) in that 'the murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind.' [FN4] At trial and on appeal, Defendant argues that this circumstance is unconstitutionally vague in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 9, of the Tennessee Constitution.

FN4. In the new criminal code this circumstance has been changed to read: 'The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.' T.C.A. § 39–13–204 (1990 Supp.).

This Court has previously upheld the validity of this aggravating circumstance in the face of similar attacks particularly where, as here, the jury has been properly instructed on the meaning of the terms used in the statute in accordance with *State v. Williams,* 690 S.W.2d 517, 526–530 (Tenn.1985). *See, e.g., State v. Henley,* 774 S.W.2d 908, 918 (Tenn. 1989); *State v. Taylor,* 771 S.W.2d 387, 399 (Tenn.1989); *State v. Thompson,* 768 S.W.2d 239, 252 (Tenn.1989); *Cf. State v. Hines,* 758 S.W.2d 515, 521–524 (Tenn. 1988).

In the instant case, the trial court's definitions of the terms 'heinous,' 'atrocious,' 'cruel,' 'depravity,' and 'torture' removed any vagueness and narrowed the class of persons eligible for the death penalty to those who have commit-

---

9. Also, the recent decision of the Tennessee Supreme Court in *Heck Van Tran v. State,* — S.W.3d —, 2001 WL 1538508 (Tenn. Dec.4,

2001) does not alter this Court's duty to follow *Penry.*

ted more aggravated murder. Torture was defined in *Williams, supra,* and the jury so instructed, as 'the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious. In proving that such torture occurred, the State, necessarily, also proves that the murder involved depravity of mind of the murderer, because the state of mind of one who willfully inflicts such severe physical or mental pain on the victim is depraved.' 690 S.W.2d at 529. As described earlier in this opinion, after killing Lakeisha's mother and sister Latoya in the adjoining bedroom, the Defendant then entered the bedroom of a frightened and defenseless six-year-old child and proceeded to kill her. Bullet holes and blood stains revealed that Lakeisha was shot once in her bed, for Officer James, when he entered her bedroom, observed a pool of blood on the bed and fragments of projectiles were recovered from the mattress. Abrasions on Lakeisha's arm indicated a bullet had grazed her as she sought to protect herself from the Defendant. There were bloody finger marks on the rail running from the head of the bed to the foot of the bed. She was found lying face down on the floor of her room, having been shot twice, once in the chest and once in the pelvic area. She was shot from a distance of six to twelve inches and died between five to thirty minutes after being shot. Three members of this Court have concluded that the jury could have found this brutal and senseless execution style murder of a helpless child, who could not protect herself, evinces torture or depravity of mind as defined in *Williams.*

The most recent pronouncement of the United States Supreme Court regarding an aggravating circumstance substantially similar to that in (i)(5) is *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 3056–3058, 111 L.Ed.2d 511 (1990), upholding as constitutional Arizona's 'especially heinous, cruel or depraved' aggravating circumstance under the limiting definitions given to those terms by the Arizona Supreme Court. The limiting definitions adopted by the Arizona court are similar to those adopted by this Court in *Williams, supra.* This issue is without merit and cannot provide a basis for relief.

815 S.W.2d at 181–82.

Petitioner's challenge to this aggravator in the post-conviction proceeding was also rejected by the Court of Criminal Appeals, which considered itself bound by the Supreme Court's earlier decision set forth above:

The petitioner contends that the aggravating circumstance dealing with a heinous, atrocious and cruel killing, T.C.A. § 39–43–204(i)(5), is unconstitutional as applied in his case. He asserts that it is vague and overbroad, is contrary to federal precedent, and resulted in 'double counting' in terms of the same acts that constitute the murders being used to prove the circumstance's existence.

In the direct appeal, our supreme court found this aggravating circumstance as instructed to be constitutional. *Black,* 815 S.W.2d at 181–82 . . .

\* \* \* \* \* \*

Also, the trial court concluded that the facts justified the application of this aggravating circumstance. We are bound by our supreme court's determinations in the direct appeal. Also, no federal authority exists that mandates a different result in this case.

1999 WL 195299, at \*25–26.

Petitioner argues that the analysis used by the Tennessee courts is contrary to, or an unreasonable application of, the follow-

ing Sixth Circuit and Supreme Court precedent: *Coe v. Bell,* 161 F.3d 320 (1998); *Houston v. Dutton,* 50 F.3d 381 (6th Cir. 1995); *Barber v. Tennessee,* 513 U.S. 1184, 115 S.Ct. 1177, 130 L.Ed.2d 1129 (1995)(Stevens, J., concurring in denial of certiorari); *Richmond v. Lewis,* 506 U.S. 40, 113 S.Ct. 528, 534, 121 L.Ed.2d 411 (1992); *Shell v. Mississippi,* 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); *Stringer v. Black,* 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992); *Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

Under the AEDPA and *Williams,* neither Justice Stevens' opinion regarding the denial of certiorari in *Barber v. Tennessee,* 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 236 (1988), nor the Sixth Circuit cases cited constitute "clearly established federal law, as determined by the United States Supreme Court."[10] As for the remaining decisions, the Court is not persuaded that they warrant disregard of the state court's decision.

The Tennessee Supreme Court determined that the trial court's definitions of the terms "heinous," "atrocious," "cruel," "depravity," and "torture" removed any vagueness. The trial court defined those terms as follows:

No death penalty shall be imposed ... unless you unanimously find that the State ... has proven beyond a reasonable doubt one or more of the following specified statutory aggravating circumstances:

\*　　\*　　\*　　\*　　\*　　\*

3) the murder was especially heinous, atrocious. or cruel in that it involved torture or depravity of mind. In determining whether or not the State has proven aggravating circumstance number three above, you are governed by the following definitions. You are instructed that the word, heinous, means grossly wicked or reprehensible, abominable, odious, vile. Atrocious means extremely evil or cruel, monstrous, exceptionally bad, abominable. Cruel means disposed to inflict pain or suffering, causing suffering, painful. Depravity means moral corruption, wicked or perverse acts. Torture means the infliction of severe physical or mental pain upon the victim while she remains alive and conscious.

(Addendum 3, at 2364–65).

This is the same instruction this Court analyzed in *Abdur'Rahman v. Bell,* 990 F.Supp. 985, 987–90 (M.D.Tenn.1998). In *Abdur'Rahman,* this Court reviewed applicable Supreme Court precedent, including those cases cited by Petitioner here, and held that even if the definition given by the trial court were unconstitutionally vague, the Tennessee Supreme Court cured that error by adopting a narrowing construction on appeal. 990 F.Supp. at 987–88. That narrowing construction, set forth in *State v. Williams,* 690 S.W.2d 517, 529–30 (Tenn.1985), required a finding of torture, defined as "the infliction of severe physical or mental pain upon the victim while he or she remains alive and conscious," or a finding of depravity, defined as acts that "occurred so close to the time of the victim's death, and must have been of such a nature, that the inference can be fairly drawn that the depraved state of mind of the murderer existed at the time the fatal

---

**10.** Petitioner concedes that the Sixth Circuit cases are not controlling Supreme Court precedent.

blows were inflicted upon the victim." 990 F.Supp. at 988. Such a narrowing construction, this Court found, was approved by the United States Supreme Court in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and *Abdur'Rahman*, 990 F.Supp. at 989.[11]

■ The Tennessee Supreme Court specifically discussed the narrowing construction given the aggravator in *State v. Williams*, and applied that narrowing construction to the facts of the murder of Lakeisha. Thus, the Court concludes that the heinous, atrocious or cruel aggravator was not unconstitutionally applied in this case, and the cases cited by Petitioner do not lead to a contrary conclusion.[12] Accordingly, Respondent is entitled to summary judgment.

*Paragraph 16: Mass Murder Aggravator*

In Paragraph 16, Petitioner argues that the "mass murder" aggravator set forth in the death penalty statute is unconstitutional under the Sixth, Eighth, and Fourteenth Amendments. Respondent argues that he is entitled to summary judgment on this claim because the Tennessee Supreme Court correctly decided on direct appeal that the aggravator was not unconstitutional under the Eighth and Fourteenth

Amendments. To the extent that Petitioner seeks to raise a Sixth Amendment claim, Respondent contends, that claim is procedurally defaulted.

The Court is persuaded that Petitioner adequately raised this claim before the Tennessee Supreme Court on direct appeal.

The Tennessee Supreme Court addressed this issue as follows:

Defendant next avers that the trial court erred in denying his motion for a judgment of acquittal as to the 'mass murder' statutory aggravating circumstance enumerated in T.C.A. § 39–2–203(i)(12). The jury found that the murder of Lakeisha Clay, Count Two, fell under the aggravating circumstance stated in Section 39–2–203(i)(12): 'The defendant committed "mass murder" which is defined as the murder of three or more persons within the state of Tennessee within a period of forty-eight (48) months, and perpetrated in a similar fashion in a common scheme or plan.'

The Defendant asserts that the 'mass murder' statutory aggravating circumstance was inapplicable to the facts of this case and should not have been submitted to the jury. The Defendant correctly states that there is only one

11. In reviewing this Court's decision, the Sixth Circuit did not address the constitutionality of the instruction in *Abdur'Rahman*, finding any error to be harmless. *Abdur'Rahman v. Bell*, 226 F.3d 696, 709–710 (6th Cir.2000).

12. Although the Court did not discuss three of the cases cited by Petitioner, *Shell v. Mississippi*, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1, *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367, and *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725, in *Abdur'Rahman*, none of these cases change the Court's analysis here because none of these cases involved the same construction given the aggravator used here. In *Shell*, the instruction struck down by the

Court, in one paragraph, did not include the phrase "in that it involved torture or depravity of mind" used by the trial court in this case. In *Clemons*, the Court assumed the unconstitutionality of the aggravator as applied by the Mississippi courts, and held that a state appellate court can uphold a death sentence based in part on an invalid aggravator either by re-weighing the aggravating and mitigating evidence or by harmless error review. In *Stringer*, the Court held that a habeas petitioner was not barred from relying on the decisions in *Maynard* and *Clemons* even though those cases were decided after his death sentence became final.

reported case where this Court has addressed the 'mass murder' statutory aggravating circumstance. Defendant relies upon language found in *State v. Bobo*, 727 S.W.2d 945, 951 (Tenn.1987), that § 39–2–203(i)(12) pertains to 'mass murders perpetrated over an extended but definite period' requires reversal by this Court because the proof in this case fails to show that the murders were committed over an 'extended' period of time. As the State accurately points out, the above-cited phrase is dicta. In *State v. Bobo*, the defendant attacked the constitutionality of the mass murder aggravating circumstance because the subsection does not expressly require that the State show that a Defendant has been 'convicted' of the murder of three or more persons and because the provision is ambiguous since it could be interpreted not to require conviction or it could be construed to require a showing of three or more convictions of murder. We agreed that there were two reasonable constructions of the statute. We then stated:

> 'We are of the opinion that while the language of T.C.A. § 39–2–203(i)(12) could be read to permit the State to present evidence of murders other than the defendant's record of convictions to show this aggravating circumstance beyond a reasonable doubt, such a construction would violate a number of State Constitutional guarantees, including the rights to a trial by an impartial jury, to an indictment or presentation, to confront witnesses against him, and against self-incrimination, all guaranteed by Article I, § 9, of the Tennessee Constitution. Essentially, therefore, such a construction would result in a procedure so unfair and prejudicial as to violate the due process of law guaranteed by

Article I, § 8, "[t]hat no man shall be taken or imprisoned, or deseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land.'"

> . . . . .

> 'In this case, in accordance with the established rule of statutory construction, we have concluded that T.C.A. § 39–2–203(i)(12) may be constitutionally applied if the triggering offenses are shown only by convictions that have been entered prior to the sentencing hearing at which they are to be utilized to establish this aggravating circumstance. "We will not declare a statute unconstitutional when we are reasonably able to do otherwise—to preserve its meaning and purpose through a constitutionally correct construction. *See Williams v. Cothron*, 199 Tenn. 618, 288 S.W.2d 698 (1956)." *Mitchell v. Mitchell*, 594 S.W.2d 699, 702 (Tenn.1980).' 727 S.W.2d at 954–55.

We concluded by holding that, 'for this section to apply, the State must show beyond a reasonable doubt (1) that the defendant had been convicted of three or more murders, including the one for which he has just been tried, (2) within the State of Tennessee, (3) within a period of forty-eight (48) months, (4) perpetrated in a similar fashion, and (5) in a common scheme or plan.' 727 S.W.2d at 956. In *State v. Bobo*, the third phrase, 'within a period of forty-eight (48) months' was not called into question. We were dealing only with the first phrase, 'that the Defendant had been convicted of three or more murders.'

The language of the subsection 'within a period of forty-eight (48) months,' would be applicable to the kinds of serial murders committed by Wayne Williams in Atlanta, by the "Son of Sam" in New York, or by Theodore "Ted" Bundy in Florida. The language would also be applicable to multiple murders such as those committed by Charles J. Whitman by sniper fire from the tower on the University of Texas campus. The term 'mass murderer' as used in the statute can apply to multiple murders committed close in time or multiple murders committed singly over a longer period of time, not to exceed four years. We are of the opinion that the statute encompasses a situation where a defendant is simultaneously tried, as in the present case, for a series of separate but related homicides committed as part of a common scheme or plan.

815 S.W.2d at 182–84.

■■■ Petitioner argues that the Tennessee Supreme Court could not constitutionally apply a broadened definition of "mass murder" on appeal to his case. According to the Petitioner, the Tennessee Supreme Court was bound by the phrase set forth in *Bobo,* which it found to be dicta, suggesting that the murders must take place "over an extended but definite period."

None of the cases cited by Petitioner,[13] however, hold that a state court cannot disregard dicta set forth in a prior case in construing a statute. As the state court did not retroactively apply new law in Petitioner's appeal, the Court concludes that application of the mass murder aggravator was not constitutionally infirm. Respondent is entitled to summary judgment on this claim.

*Paragraph 17: Avoiding Arrest Aggravator*

In Paragraph 17, Petitioner contends that the evidence introduced at trial and the sentencing hearing were insufficient to support application of the "avoiding arrest" aggravator, and that application of this aggravator violates the Sixth, Eighth, and Fourteenth Amendments. Respondent argues that he is entitled to summary judgment on this claim because the Tennessee Supreme Court correctly decided on direct appeal that the aggravator applied to the facts adduced in the trial court, and rejected Petitioner's Eighth and Fourteenth Amendment challenges. To the extent that Petitioner seeks to raise a Sixth Amendment claim, Respondent contends, that claim is procedurally defaulted.

The Court is persuaded that Petitioner adequately raised this claim before the Tennessee Supreme Court on direct appeal.

The Tennessee Supreme Court addressed this issue as follows:

The Defendant also contends that the trial court erred in denying his motion for a judgment of acquittal as to the statutory aggravating circumstance contained in T.C.A. § 39–2–203(i)(6), relative to a murder 'committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another.' The jury found the existence of this statutory aggravating circumstance and returned a verdict of death as to Count Two of the indictment, regarding the death of Lakeisha Clay, the six year-old daughter of Angela Clay, whose body was found in a separate bedroom from the bodies of the other two victims. The Defendant

---

**13.** Petitioner cites *Bush v. Gore,* 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000), *Reddix v. Thigpen,* 805 F.2d 506 (5th Cir.1986), and *Booth–El v. Nuth,* 140 F.Supp.2d 495 (2001) to support his argument.

avers that there was insufficient evidence at either the guilt or sentencing phases of the trial as to the sequence of the murders; therefore, there was no evidence that Lakeisha Clay witnessed the murders of her mother and/or her sister.

The State contends that there was indeed sufficient evidence to support application of this statutory aggravating circumstance. Two victims were in one bedroom and Lakeisha Clay was in a second bedroom of the small apartment. Witnesses established that the shots could be heard outside the apartment.

The State avers that had Lakeisha been shot first, Lakeisha's mother, Angela Clay, would not have remained in her bed under the covers in a position where she could have been killed with a single gunshot wound to the head. There was no proof that Angela Clay had moved or been moved after she was shot. Even if Lakeisha did not visually witness the murders of her family, she certainly heard the gunshots. She could have identified the Defendant.

We are of the opinion that the proof supports a finding that Lakeisha's mother was shot first as she lay sleeping in her bed. Since the upstairs neighbors heard the gun blasts, Angela Clay would surely have awoken if the first shots fired had been those aimed at Lakeisha in the second bedroom. The proof is sufficient to support the finding of this aggravating circumstance.

Considering the validity of the remaining statutory aggravating circumstances [FN5], any error created by the insufficiency of the evidence to support the jury's finding on this contested circumstance is harmless and could not have created prejudice to the Defendant. A harmless error analysis may be applied to these circumstances. *State v. Bobo,* 727 S.W.2d 945, 956 (Tenn.1987); *State v. Cone,* 665 S.W.2d 87, 94 (Tenn. 1984).

---

FN5. The Defendant has not challenged three of the aggravating circumstances, T.C.A. §§ 39–2–203(i)(1), (2) and (7).

815 S.W.2d at 182.

Petitioner has not advanced a reason why the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, or involves an unreasonable determination of the facts. Accordingly, Respondent is entitled to summary judgment on this claim.

*Paragraph 18: Felony Murder Aggravator*

In Paragraph 18, Petitioner alleges that applying the felony murder aggravator, along with the mass murder and avoiding arrest aggravators, to the death of Lakeisha Clay resulted in "double counting" in violation of the Sixth, Eighth and Fourteenth Amendments. Respondent argues that this claim is procedurally defaulted because it was not raised in state court. Petitioner has not advanced a basis for avoiding the procedural default, and therefore, Respondent is entitled to summary judgment on this claim.[14]

---

14. To the extent Petitioner is relying on Tennessee Code Annotated Section 39–2–205 (relating to the Tennessee Supreme Court's review in death penalty cases) as a basis for excusing his failure to raise claims in state court, the Court is not persuaded that the state court's review under this provision provides a basis for avoiding the procedural default bar. *See Workman v. Bell,* 178 F.3d 759, 775 (6th Cir.1998); *Coe,* 161 F.3d at 336 (discussed *infra* ); *Abdur'Rahman v. Bell,* 999 F.Supp. 1073, 1079–80 (M.D.Tenn.1998)(Section 39–2–205 does not excuse failure to present claims to state court on issues not specifically delineated), *rev'd on other grounds,* 226 F.3d 696 (6th Cir.2000). *See infra* note 14 and accompanying text.

*Paragraph 19: Admission of Prior Conviction at Sentencing*

In Paragraph 19, Petitioner contends that admission of his prior conviction for assault on Bennie Clay violated the Sixth, Eighth and Fourteenth Amendments because his plea to the charge was involuntary, and his counsel failed to investigate his mental state. Respondent argues that Petitioner may not challenge the prior conviction in this proceeding.

█ The Supreme Court has held that habeas relief is not available to a state prisoner challenging a current sentence on the ground that it was enhanced by an unconstitutional prior conviction for which the petitioner is no longer in custody, unless the prisoner shows he was not appointed counsel in connection with the prior conviction. *Lackawanna County District Attorney v. Coss*, 532 U.S. 394, 121 S.Ct. 1567, 149 L.Ed.2d 608 (2001). As Petitioner has not shown that he is still serving the sentence for the prior conviction or that he was unrepresented in connection with the prior conviction, Respondent is entitled to summary judgment on this claim.

*Paragraph 20: Prosecutorial Misconduct*

In Paragraph 20, Petitioner argues that the prosecutor made the following comments at his trial that violated his constitutional rights under the Sixth, Eighth and Fourteenth Amendments: (1) misstated the meaning of premeditation; (2) stated that failing to give Petitioner the death penalty for the two child victims would reward him because the killing of their mother would already result in a life sentence [referred to by the Petitioner as the "freebie" argument]; and (3) commented on Petitioner's failure to show remorse.

Respondent contends that Petitioner raised only the "freebie" argument in state court, and only in connection with his claim that counsel was ineffective for failing to object to the argument. Therefore, Respondent argues, these claims are procedurally defaulted.

Petitioner seeks to overcome the procedural default by arguing that the failure to raise these claims in state court was caused by the ineffectiveness of Petitioner's counsel at trial and on direct appeal, constituting "cause" for his procedural default.

█ In *Edwards v. Carpenter*, 120 S.Ct. at 1591–92, the Supreme Court held that an ineffective assistance of counsel claim, in order to constitute cause for the procedural default of another federal claim, must have been presented to the state court.

The Petitioner's ineffective assistance of counsel claims in state court did not include a claim that counsel failed to object to the premeditation comment or the lack of remorse comment. Therefore, Petitioner's assertion of ineffective assistance of counsel as cause for the failure to raise these prosecutorial misconduct claims must fail.

█ As for the "freebie" comment, Petitioner argued in the post-conviction proceeding that trial counsel was ineffective for failing to object to this comment, and that appellate counsel was ineffective for failing to raise this argument on direct appeal. 1999 WL 195299, at *18. As set forth above, the Court of Criminal Appeals determined that Petitioner had failed to establish his ineffective assistance claim on these grounds. *Id.*, at *18–19.

Petitioner has not advanced a basis for disregarding the state court's decision as contrary to, or an unreasonable application of, clearly established federal law. Therefore, the Court is bound by the state

court's decision rejecting the ineffective assistance of counsel claim. As ineffective assistance of counsel has not been established, Petitioner has failed to establish cause for his failure to raise the "freebie" argument in state court.

Accordingly, Respondent is entitled to summary judgment on Petitioner's prosecutorial misconduct claims.

*Paragraph 21: Failure to Instruct Regarding Life Sentence*

In Paragraph 21, Petitioner alleges that the trial judge's failure to instruct the jury that Petitioner would not be subject to parole if given a life sentence violated his rights under the Eighth and Fourteenth Amendments. In response to Respondent's procedural default argument, Petitioner contends that he raised this argument in the post-conviction appeal.

Petitioner's post-conviction appeal brief makes the following claim: "Once The Prosecutor Told The Jury That To Give A Third Life Sentence Was A Reward, The Trial Court's Failure To Instruct The Jury Regarding Parole Eligibility And The Failure Of Defense Counsel To Request That The Court Instruct Regarding Parole Eligibility For Three Life Sentences Denied Mr. Black His Constitutional Right To Present A Defense And To The Effective Assistance Of Counsel." (Addendum 22, at 79). In support of this claim, Petitioner argued "the trial court declined to instruct the jury on the questions regarding how the sentences would run and the time Mr. Black would be required to serve prior to parole eligibility." *Id.* Although phrased in the context of an ineffective assistance of counsel claim, the Court is satisfied that Petitioner adequately presented this claim to the state court.

The Court of Criminal Appeals addressed this issue as follows:

D. Instruction on Parole Eligibility

The petitioner also contends that trial counsel were ineffective for failing to request the trial court to instruct the jury regarding parole eligibility. However, we note that our supreme court has concluded that there is no error in not giving such an instruction. *See State v. Bush*, 942 S.W.2d 489, 503–04 (Tenn.1997).

1999 WL 195299, at *19.

 In *State v. Bush*, the Tennessee Supreme Court distinguished *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 2190, 129 L.Ed.2d 133 (1994), in which the United States Supreme Court held that where a defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is not eligible for parole. 942 S.W.2d at 503. The *Bush* Court pointed out that "[i]f parole *is* an option for a defendant sentenced to life imprisonment, however, the *Simmons* Court emphasized that it will not second-guess the refusal of a State to allow proof, instruction, or argument to the jury on the availability of parole." *Id.* Because Tennessee is a state in which defendants sentenced to life imprisonment are eligible for parole, the court explained, the decision in *Simmons* does not require that the jury be given information about parole availability. *Id.*

Petitioner does not advance a basis for disregarding the state court's reasoning on this issue. Although he cites *Simmons,* Petitioner principally relies on the Supreme Court's decision in *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). In *Skipper,* the Supreme Court held that the trial court erred in excluding evidence regarding the defendant's behavior while in prison to be offered in mitigation of defendant's punishment. Petitioner also cites *Gardner v.*

*Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), which holds that a defendant may not be sentenced to death based on information in a presentence report to which he had no access and no opportunity to deny or explain. Neither of these cases alter the Supreme Court's subsequent decision in *Simmons* which governs the issue here.

Even if this Court were not bound by the state court's decision, it is not persuaded that Petitioner is otherwise entitled to relief. Assuming that the *Simmons* decision required a jury instruction on parole eligibility under Tennessee's sentencing scheme as it existed at the time of trial, the Supreme Court has held that *Simmons* does not apply retroactively. *O'Dell v. Netherland,* 521 U.S. 151, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). *See also Coe v. Bell,* 161 F.3d at 346.

Respondent is entitled to summary judgment on this claim.

*Paragraph 22: Jury Instructions on Reasonable Doubt*

In Paragraph 22, Petitioner contends that the trial court's instructions to the jury on reasonable doubt violated the Sixth, Eighth and Fourteenth Amendments. Respondent argues that this claim is procedurally defaulted, but Petitioner contends that the error was structural, and therefore, failure to review the claim would result in a fundamental miscarriage of justice.

The Court need not decide the procedural default issue because it is not persuaded that Petitioner is entitled to relief on the merits of this claim. The Sixth Circuit has held that reasonable doubt jury instructions like those given here (Addendum 3, at 2123) are not unconstitutional. *See Cone v. Bell,* 243 F.3d at 971–72; *Austin v. Bell,* 126 F.3d 843, 846–47 (6th Cir.1997).

*Paragraph 23: Jury Instructions on Premeditation and Deliberation*

 Paragraph 23 of the Amended Petition alleges that the jury instructions given at trial defining premeditation and deliberation violated the Sixth, Eighth and Fourteenth Amendments because they did not comply with the Tennessee Supreme Court's decision in *State v. Brown,* 836 S.W.2d 530 (Tenn.1992), a decision rendered after the trial in this case. Respondent contends that this claim involves an issue of state law and is not cognizable on habeas review.

The Court agrees. In determining that *Brown* did not require issuance of the writ in another case, the Sixth Circuit explained that "When and how state law applies to a particular case is a matter on which the state supreme court has the last word ... No federal issues are implicated and no federal question is presented in determining whether a change in state law is to be applied retroactively." *Houston v. Dutton,* 50 F.3d at 384–85; *Alley v. Bell,* 101 F.Supp.2d 588, 657 (W.D.Tenn.2000)("... reliance on *Brown* simply does not raise a cognizable federal claim, but merely a claim under state substantive law.") Respondent is entitled to summary judgment on this claim.

*Paragraph 24: Denial of Investigative and Expert Funds*

In Paragraph 24, Petitioner argues that he was denied funds by the trial court for a forensic pathologist and a juristic psychologist in violation of the Sixth, Eighth and Fourteenth Amendments. Respondent argues that the Tennessee Supreme Court correctly affirmed on direct appeal the trial court's denial of funds for a juristic pathologist. As for the denial of funds for a forensic pathologist, Respondent argues that Petitioner has procedurally defaulted this claim by failing to raise it in state court.

In upholding the denial of funds for a juristic psychologist, the Tennessee Supreme Court held:

The Defendant alleges that the trial court erred in denying him funds to employ a juristic psychologist in order to insure that the full and candid responses from prospective jurors would be completely evaluated.

Prior to the trial, defendant counsel filed a motion for funds to employ a juristic psychologist. Noting that Defendant's request did not comply with Section 1(B)(10) of Supreme Court Rule 13, the trial court denied the request. The court held that, even if the rule had been complied with, it would find no due process need to appoint a juristic psychologist.

The Defendant contends that without the assistance of a juristic psychologist, he was denied a full evaluation of the propensities of prospective jurors for fairness and bias and was denied his right to an impartial jury and due process rights to a fair trial. T.C.A. § 40–14–207(b) allows the trial court in a capital case the discretion to grant funds for expert services necessary to insure that the constitutional rights of an indigent defendant are properly protected. There has been no showing of any special need for a jury selection expert or that the trial judge in this case has abused its discretion.

Although there is no case directly on point in this jurisdiction, other states that have addressed the issue of a trial court's propriety in denying a motion for funds for a jury selection expert have found that there is no error in the trial court's denial where the defendant has failed to particularize his need for such

an expert, even in death penalty cases. In *State v. Williams*, 304 N.C. 394, 284 S.E.2d 437, 446 (N.C.1981), the court found no error in refusing a jury selection expert when the record showed no reasonable likelihood that appointment of an expert would have materially assisted the defendant in his defense or that the absence of assistance deprived the defendant of a fair trial. *See also State v. Yates*, 280 S.C. 29, 310 S.E.2d 805, 809 (1982); Annot. 34 A.L.R.3d 1256, § 17 (1990 Supp.).

815 S.W.2d at 179–80.

Petitioner has not advanced a reason for disregarding the state court's decision on the juristic psychologist issue. Therefore, Respondent is entitled to summary judgment on that issue.

■ As for the denial of funds for a forensic pathologist, Petitioner claims, based on a discussion in *Coe v. Bell*, 161 F.3d at 335–36, that this claim is not defaulted even though he failed to raise the issue on appeal in state court. In *Coe*, the Sixth Circuit held that the petitioner's challenge to the trial court's unanimity instructions was not defaulted:

... Coe did raise this issue in his direct appeal, apparently by incorporating it from his motion for a new trial. Also as mentioned above, the state supreme court held that the death-sentence statute was not constitutionally infirm. It is not clear if this holding applies to the unanimity provisions, however, and the cases cited by the state supreme court on direct appeal do not cover unanimity... The district court responded to this by citing Tennessee Code § 39–2–205 [15] and *State v. Martin*, 702 S.W.2d

**15.** At the time of trial, that section stated:

39–2–205. Review of death sentence.

(a) Whenever the death penalty is imposed for murder in the first degree and upon the judgment becoming final in the

560, 564 (Tenn.1985) for the notion that, in capital cases, the state supreme court has to review significant errors, whether or not they were raised by the defendant.

As phrased by the district court, this proposition is too broad, as it would eliminate the entire doctrine of procedural bar in Tennessee in capital cases.... *Martin* though cited § 39–2–

205 and reviewed a question that had been discussed but not preserved for review at trial. *Martin,* 702 S.W.2d at 564. A *fortiori* because the issue in this case was not only discussed but formally contested, *Martin* applies to eliminate the procedural bar problem for Coe ...

161 F.3d at 336 (citations omitted).

This discussion indicates that the petitioner in *Coe* raised the issue on direct

---

trial court, the defendant shall have the right of direct appeal from the trial court to the Tennessee Supreme Court, which shall have exclusive appellate jurisdiction, provided that the sentence of death shall be automatically reviewed by the Tennessee Supreme Court and said sentence review shall be consolidated for consideration with the direct appeal, if prayed for. If the defendant has been convicted of first-degree murder and sentenced to death and appeals that conviction and sentence, the record as to guilt and sentence shall be expeditiously filed with the Tennessee Supreme Court within the time limit provisions of Tènnessee Rules of Procedure Rules 24 and 25. If the defendant has been convicted of first-degree murder and sentenced to death but does not appeal the conviction of first-degree murder, then the trial judge shall certify, within ninety (90) days after the judgment has become final, the record relating to punishment and the same shall be transmitted by the clerk of the trial court to the Tennessee Supreme Court. If the defendant has been convicted of other crimes at the same trial wherein a death sentence is imposed, the Tennessee Supreme Court shall have authority to review by direct appeal such other crimes if appealed by the defendant with the conviction of first-degree murder and sentence of death.

(b) The appeal of the conviction of first-degree murder and the review of the sentence of death shall have priority over all other cases and shall be heard according to rules promulgated by the Tennessee Supreme Court. The Tennessee Supreme Court shall first consider any errors assigned and then the court shall review the sentence of death.

(c) In reviewing the sentence of death for murder in the first degree, the Tennessee Supreme Court shall determine whether:

(1) The sentence of death was imposed in any arbitrary fashion;

(2) The evidence supports the jury's findings of a statutory aggravating circumstance or statutory aggravating circumstances;

(3) The evidence supports the jury's finding of the absence of any mitigating circumstances sufficiently substantial to outweigh the aggravating circumstance or circumstances so found; and

(4) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. The Tennessee Supreme Court may promulgate rules as it deems appropriate to establish such procedures as are necessary to enable it to properly review the death sentence.

(d) In addition to its other authority regarding correction of errors, the Tennessee Supreme Court, in reviewing the death sentence for murder in the first degree, is authorized to:

(1) Affirm the sentence of death; or

(2) Modify the punishment to life imprisonment.

(e) In the event that any provision of §§ 39–2–202—39–2–204, 39–2–206 or this section or the application thereof to any individual or circumstance is held to be invalid or unconstitutional by the Tennessee Supreme Court or a federal court, so as permanently to preclude a sentence of death as to that individual, the court having jurisdiction over such individual previously sentenced to death shall cause such individual to be brought before the proper court which shall sentence such person to imprisonment for life.

appeal. The Petitioner in this case, by contrast, did not challenge the trial court's denial of funds for a pathologist on appeal. Therefore, the analysis in *Coe* does not provide a basis for avoiding the procedural default of this claim. Respondent is entitled to summary judgment on this claim.[16]

*Paragraph 25: Petitioner's Statements to Police*

In Paragraph 25, Petitioner alleges the two statements he made to police were obtained in violation of his rights under the Fifth, Sixth and Fourteenth Amendments. Petitioner argues that as a result of retardation and mental disturbance, he did not intelligently and voluntarily waive his rights to silence and counsel before giving the first statement. Petitioner also argues that his request for counsel was ignored by the police.

With regard to the second statement, Petitioner argues that the statement was obtained in violation of his right to effective assistance of counsel and should not have been admitted at trial. Petitioner alleges that his attorney at that time, Robert Skinner, provided ineffective assistance by failing to consult with the officers about the information provided by Petitioner during the first interview and the evidence they had discovered linking Petitioner with the murders, and by failing to advise him about what information he could provide in a second interview.

■■■ Respondent argues that Petitioner did not raise the arguments regarding his first statement—that it was not knowing and voluntary, and that police ignored his request for counsel—in state court. Although he does not address this argument directly, Petitioner argues that he estab-

lished cause for any procedural default by showing that counsel was ineffective for failing to raise this issue in state court. As discussed above, Petitioner has not established cause through ineffective assistance of counsel. Therefore, Respondent is entitled to summary judgment on this claim.

As for the second statement, Respondent argues that Petitioner's Sixth Amendment right to the effective assistance of counsel had not attached because he had not yet been charged. Alternatively, Respondent argues that the Tennessee Supreme Court's decision on direct appeal that counsel was not ineffective was correct.

The Tennessee Supreme Court addressed this issue as follows:

The Defendant next alleges that the trial court erred by not granting him a new trial based upon the use at trial of his second tape recorded statement which was the result of the ineffective assistance of counsel during a pretrial custodial interrogation.

The trial court, at the conclusion of the hearing on the motion for new trial, discussed the two-pronged test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He stated, 'In order to prevail, the defendant must show that both counsel's representation fell below an objective standard of reasonableness, and that there exists a reasonable probability that but for counsel's unprofessional error, the results of the proceedings would have been different.' He then cited *Strickland* and stated: 'The reasonableness of counsel's actions may be determined or substantially influenced by the

---

**16.** Even if this claim were not procedurally defaulted, Petitioner has not submitted proof indicating that the testimony of the medical examiner at trial was in error, and the Court

notes that the physical proof corroborates the medical examiners' testimony that Lakeisha Clay did not die instantaneously.

defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed, strategic choices made by the Defendant and on information supplied by the defendant.'

The Court then stated that whether counsel's representation fell below an objective standard of reasonableness was a close question and one he need not decide because 'even if I were to decide it fell below an objective standard of reasonableness, would the results of the proceeding been different, or is there a reasonable probability that the results of the proceeding would have been different.... I have no trouble in finding that the results of the proceedings would not have been different.'

The record of the hearing on the motion for a new trial shows that Robert Skinner had been practicing law since 1961 and during that time his principle practice had been criminal defense work. He had handled thousands of criminal cases and had had more than ten homicide cases. He had represented the Defendant in the case involving the shooting of Bennie Clay but had refused to represent the Defendant in this case and had attempted to refer him to the Public Defender's office. Defendant still requested that Skinner assist him during this interview so Skinner consulted with Defendant and police officers about the status of the case. Skinner had an extended discussion with the Defendant regarding culpability and alibi. From his previous relationship with the Defendant, Skinner believed Defendant's protestations of innocence and felt that the best thing for the Defendant to do would be to clarify prior inconsistencies in his statements and completely, truthfully and accurately disclose his activities the evening of the murders. Defendant had already given a statement to police in which, contrary to his other statements,

had placed him at the murder scene that night. He knew there were fingerprints on the telephones. He had made other inconsistent statements concerning his alibi. In his earlier statement, he stated he picked up Angela Clay at 10 p.m., took her home, and went to Charlotte Waldon's house for a late dinner. Charlotte Waldon had told officers he had been there earlier in the evening and left around 9:30 p.m.

From the record it appears that Defendant willingly talked with police after Skinner apprised him of the dangers of further interviews and that Skinner and the Defendant decided together that it was the best strategy for him to speak with officers and tell the truth and 'clear up anything that he was going to stand by.'

The advice given, or the services rendered by an attorney, must be within the range of competence demanded by attorneys in criminal cases. *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn.1975). The mere fact that counsel advises an accused to make a statement to the police does not constitute inadequate representation as a matter of law, *Phelps v. State,* 435 So.2d 158, 161 (Ala.Crim.App. 1983), particularly where that advice makes it clear that the decision ultimately lies with the accused. *Commonwealth v. Kesting,* 274 Pa.Super. 79, 417 A.2d 1262, 1265 (1979). *See generally* Annot., 'Adequacy of Defense Counsel's Representation of Criminal Client Regarding Confessions and Related Matters', 7 A.L.R.4th 180, § 19–20 (1981).

We are of the opinion that under the standard of *Strickland v. Washington* and *Baxter v. Rose,* counsel's representation does not require a new trial.

815 S.W.2d at 184–85.

█ In response to Respondent's argument, Petitioner refers to the brief he

filed in the Tennessee Court of Criminal Appeals on this issue. (Addendum 22, at 67–68). There, Petitioner argues that Mr. Skinner should have asked the Petitioner what he had already told the police, and should have consulted the police about the evidence they had against the Petitioner. As shown above, however, the Tennessee Supreme Court determined that Mr. Skinner's consultation with the police and the Petitioner prior to the second interview was not deficient. This Court is not persuaded that the state's court's finding was "an unreasonable determination of the facts," or that the state court's decision was otherwise contrary to, or an unreasonable application of, clearly established federal law. Accordingly, Respondent is entitled to summary judgment on the ineffective assistance of counsel issue.

### Paragraph 26: Failure to Allow Questioning of Jurors

In Paragraph 26, Petitioner alleges that the trial court precluded trial counsel from questioning prospective jurors about their feelings regarding parole eligibility and the deterrent effect of the death penalty. Respondent argues that this claim is procedurally defaulted. As Petitioner has not suggested a basis for setting aside the procedural default, Respondent is entitled to summary judgment on this claim.

### Paragraph 27: Exclusion of Prospective Jurors

In Paragraph 27, Petitioner contends that the trial court violated the Sixth, Eighth, and Fourteenth Amendments by improperly excluding prospective jurors based on their views about the death penalty.[17] Respondent argues that Petitioner is not entitled to relief on this claim because it was properly rejected by the Tennessee Supreme Court on direct appeal. Petitioner contends that the Tennessee Supreme Court's decision was contrary to, and an unreasonable application of, the United States Supreme Court's decision in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

On direct appeal, the Tennessee Supreme Court addressed this claim as follows:

> The Defendant argues that the trial court erred in excusing certain prospective jurors because of their feelings about the death penalty without allowing questioning by Defendant's counsel. Voir dire was conducted as follows: First, individual voir dire was conducted as to two issues—(1) the effect of the prospective juror's views regarding the death penalty on the juror's ability to follow the law of capital sentencing and (2) the prospective juror's exposure to outside information about the case. The court conducted a general preliminary examination on these matters; and, if

---

17. Specifically, Petitioner challenges the exclusion of Wilma Williams, Claude Reynolds, James Williams, Lisa McLean, Danny Hailey, and Lynn Stringfellow. (Amended Petition, at ¶ 27).

In response to questioning by the trial judge, Ms. Williams testified that she was against the death penalty, and initially stated that she could set her personal feelings aside and follow the law, but later stated: "I'm not really sure. I can't absolutely say that I could, a definite yes." (Addendum 3, at 278–82).

Mr. Reynolds testified that he was against the death penalty for religious reasons, and that he was not sure he could vote for the death penalty if the law required that he do so, describing the situation as presenting him with a "moral quandary." (Addendum 3, at 760–768).

In response to a question by the trial judge, Mr. Williams, Ms. McLean, Mr. Hailey, and Ms. Stringfellow stated that they could not impose the death penalty even if required to do so by law. (Addendum 3, at 319–323; 587–593; 1143–1147; 1157–1162).

the juror's answers did not give clear grounds for excusal for cause, the State, followed by the defense, then fully explored these issues with each juror. When thirty-six prospective jurors had completed individual voir dire, the parties conducted group voir dire on other matters and exercised their peremptory challenges.

The Defendant challenges the trial court's actions regarding six prospective jurors. He says that the trial court's refusal to allow him to conduct voir dire of these six jurors, after the trial court had concluded from its preliminary examination that the juror's views on the death penalty would prevent their following the law, violated Defendant's rights under the state and federal constitutions. Defendant's broader argument appears to be that in capital cases judges should not voir dire prospective jurors regarding their views on the death penalty because the court's examination might inhibit the free and truthful expression of the juror's opinions.

We find the trial court committed no error in the present case. The responses of the prospective jurors revealed that their views on the death penalty would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and their oaths. This met the standard of *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

Under the standard set by this Court in *State v. Alley,* 776 S.W.2d 506, 517–518 (Tenn.1989), according the trial court's finding of bias a presumption of correctness, no reversible error occurred in this case in the court's refusal to allow the defendant to rehabilitate these ju-

rors. *See State v. Strouth,* 620 S.W.2d 467, 471 (Tenn.1981).

815 S.W.2d at 180–81.

In *Adams,* the Supreme Court held that a Texas statute that disqualified a prospective juror in a capital case unless the juror stated that the mandatory penalty of death or life imprisonment would not affect his deliberations on any issue of fact was overbroad. 100 S.Ct. at 2525. In reaching its conclusion, the Court articulated the standard for determining when the exclusion of a juror for cause because of his views regarding capital punishment was permissible under the Constitution:

... a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Id.,* 100 S.Ct. at 2526.

The Court reaffirmed the standard set forth in *Adams* in *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and held that a state court's determination that a prospective juror shall be excluded for cause based on his views regarding capital punishment is a "factual issue" to be accorded the presumption of correctness under a previous version of Section 2254. 105 S.Ct. at 855–57.

■ Petitioner has not suggested how the Tennessee Supreme Court's decision on appeal was contrary to or an unreasonable application of *Adams* or other Supreme Court jurisprudence on this issue. Nor has Petitioner shown that *Adams* requires the trial court to allow rehabilitation questioning by defense counsel under the circumstances presented here. According-

ly, Respondent is granted summary judgment on this claim.

### Paragraph 28: Failure to Give Requested Instructions

In Paragraph 28, Petitioner alleges that the trial court violated the Eighth and Fourteenth Amendments by failing to give the following requested jury instructions during the penalty phase of the trial: (1) a detailed instruction regarding non-statutory mitigating circumstances; (2) an instruction that "life is life;" and (3) an instruction that the court had the power to impose consecutive life sentences.

Respondent argues that this claim is procedurally defaulted. As Petitioner has not suggested a basis for setting aside the procedural default, Respondent is entitled to summary judgment on this claim.

### Paragraph 29: Jury Verdict Form

In Paragraph 29, Petitioner alleges that the jury verdict form used at trial failed to specify that the jury had found the listed aggravating circumstances beyond a reasonable doubt, in violation of the Sixth Eighth and Fourteenth Amendments. Petitioner has failed to cite any legal support suggesting that the jury verdict form used in this case is constitutionally deficient. Accordingly, the Court grants summary judgment to the Respondent on this claim.

### Paragraphs 30 and 31: Proportionality Review

In Paragraph 30, Petitioner argues that the proportionality and arbitrariness review conducted by the Tennessee Supreme Court was constitutionally deficient. In Paragraph 31, Petitioner argues that his death sentence is disproportionate because of his mental retardation in violation of his rights to equal protection and due process.

Respondent argues that Petitioner's allegation regarding state appellate review do not raise a cognizable claim for habeas relief as it involves only a question of state law. As for any Eighth Amendment proportionality allegation, Respondent argues that this claim is procedurally defaulted because it was not raised in state court.

■ At the time of Petitioner's trial, a Tennessee statute, Tennessee Code Annotated § 39–2–205(c)(4), required the Tennessee Supreme Court, on review, to determine whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant." On direct appeal, the Tennessee Supreme Court specifically concluded that Petitioner's sentence was not excessive or disproportionate to the penalty imposed in similar cases:

> We have reviewed the sentence of death in accord with the mandates of T.C.A. § 39–2–205 (1982) and are satisfied that the evidence warrants imposition of that penalty. Our comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the Defendant. Defendant deliberately killed an innocent, helpless, frightened child. His acts were those of a cold-blooded executioner who showed a total disregard for human life. This brutal and senseless murder places the Defendant Black into the class of defendants deserving capital punishment and is not disproportionate to sentences imposed in similar cases. See, State v. Barber, 753 S.W.2d 659 (Tenn.1988) . . .

815 S.W.2d at 191.

To the extent Petitioner challenges the state court's analysis under state law, he has failed to state a cognizable claim for habeas relief.

Petitioner also argues, however, that the state court's analysis violates his federal due process rights because he was not given notice of the actual standards to be used by the court when it conducted proportionality review. To support this argument, Petitioner cites *Harris v. Blodgett*, 853 F.Supp. 1239, 1286–1291 (W.D.Wash. 1994), *aff'd on other grounds*, 64 F.3d 1432 (9th Cir.1995), in which a federal district court in Washington held that the Washington statute governing proportionality review violated the petitioner's due process rights because it set forth no guidelines or procedures for carrying out the review.

In this case, Petitioner has not demonstrated that the Tennessee proportionality review statute has defects similar to those identified by the Washington court, nor has he demonstrated that the proportionality review conducted by the state court in this case was so inadequate as to violate due process.

Petitioner also argues that the death sentence is disproportionate as a matter of federal law under the Eighth Amendment because he is mentally retarded. As discussed above, the Supreme Court has held that the Eighth Amendment does not bar the execution of a mentally retarded person by virtue of his or her mental retardation alone. *Penry*, 109 S.Ct. at 2953–55, 2958. Therefore, the Court concludes that Petitioner's Eighth Amendment claim is without merit.

Respondent is entitled to summary judgment on the claims presented in Paragraphs 30 and 31.

*Paragraph 32: Constitutionality of Death Sentence—Lack of Standards*

In Paragraph 32, Petitioner alleges that his death sentence violates due process and equal protection because at the time of his trial, prosecutors in Tennessee were not guided by any hard and fast standards in determining whether to seek the death penalty. Petitioner cites *Bush v. Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) to support his claim. In response to Respondent's argument that this claim has been procedurally defaulted because it was not raised in state court, Petitioner argues that *Bush* establishes a new rule of law which is to be applied retroactively.

The Court concludes that it need not decide the procedural default issue as it is not persuaded that Petitioner's claim has merit. The Supreme Court has refused to strike down various death penalty statutes on the ground that those statutes grant prosecutors discretion in determining whether to the seek the death penalty. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976)(Petitioner's argument "that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense" does not indicate that system is unconstitutional); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976)(same); *Campbell v. Kincheloe*, 829 F.2d 1453, 1465 (9th Cir.1987)(Supreme Court has rejected argument that death penalty statute is unconstitutional because it vests unbridled discretion in prosecutor to decide when to seek the death penalty). *See also United States v. Davis*, 904 F.Supp. 554, 559 (E.D.La.1995)("[A] general challenge to the ability of the government to decide to pursue capital punishment against certain defendants must fail."). The decision in *Bush v. Gore*, a case involving the method of counting ballots for a presidential election, does not require a different result. Accordingly, Respondent is entitled to summary judgment on this claim.

*Paragraph 33: Constitutionality of Death Penalty*

In Paragraph 33 of the Amended Petition, the Petitioner argues that the Ten-

nessee death penalty statute violates the Sixth, Eighth and Fourteenth Amendments because: (a) the statute precludes the sentencing jury from knowing that a non-unanimous verdict results in a life sentence; (b) the death penalty cannot be applied with reasonable consistency; (c) lethal injection constitutes cruel and unusual punishment; (d) death by electrocution constitutes cruel and unusual punishment; (e) execution of Petitioner violates due process and equal protection; (f) the death sentence is unreliable; and (g) the death penalty is unconstitutional for all the reasons rejected by the Tennessee Supreme Court in *State v. Black*, 815 S.W.2d at 185–191.

Respondent contends that Petitioner has procedurally defaulted the grounds stated in subparagraphs (a), (b) and (c), and has defaulted the equal protection allegation set forth in subparagraph (e). As for the claims in subparagraphs (d) and (f) and the due process claim in subparagraph (e), Respondent contends that the state courts correctly rejected those claims. In response to these arguments, Petitioner relies on the brief filed in his direct appeal in state court. (Addendum 5).

Petitioner has not suggested that the claims in subparagraphs (a), (b), (c) and the equal protection allegation in subparagraph (e) have been exhausted in state court, and has not advanced a basis for avoiding the procedural bar through a showing of cause and prejudice, or miscarriage of justice. Accordingly, Respondent is entitled to summary judgment on these claims.

As for the claim in subparagraph (d)—that death by electrocution constitutes cruel and unusual punishment—the Tennessee Supreme Court addressed this claim on direct appeal as follows:

> The Defendant next complains that the trial court erred in denying his motion to exclude the death penalty because electrocution is cruel and unusual punishment. Citing accounts of the suffering experienced in death by electrocution, he argues that even if death itself is not unconstitutional, electrocution as a means of death violates the Eighth Amendment. T.C.A. § 40–23–114 requires that any person sentenced to death shall be put to death by electrocution... In *State v. Adkins*, 725 S.W.2d 660, 664 (Tenn.1987), the Defendant also alleged that the use of electrocution, when there are more humane forms of legal killing, such as lethal injection, violates the constitutional prohibition against cruel and unusual punishment. Justice Fones, speaking for the Court, stated: 'The validity and humanity of that complaint should be addressed to the Legislature. This Court's authority over punishment for crime ends with the adjudication of constitutionality.' *See State v. Barber*, 753 S.W.2d 659, 670 (Tenn.1988); *State v. Caldwell*, 671 S.W.2d 459, 466 (Tenn.1984). [For a list of Tennessee and federal cases rejecting this argument, *see Teague v. State*, 772 S.W.2d 915, 924, n. 13 (Tenn.Crim.App. 1988).]

> Although not raised as an issue on appeal, Chief Justice Reid, in his dissenting opinion, states that he 'would remand the case to the trial court to afford the defendant the opportunity to present evidence on the allegation that electrocution as a means of imposing the death penalty is cruel and unusual punishment in violation of Article I, Section 16 of the Tennessee Constitution.' He states 'that electrocution as a method of imposing the death penalty may be cruel and unusual punishment' and would, therefore, like the trial court to re-examine this issue. He further states that 'the literature ... suggests that electrocution involves suffering be-

yond that necessary "in any method employed to extinguish life humanely." ' The dissenting opinion asks the trial court to review evidence of the actual pain inflicted by electrocution in order to determine whether this method of extinguishing a prisoner's life involves 'unnecessary cruelty.'

A majority of this Court is of the opinion that electrocution is a constitutionally permissible method of execution. The argument raised in the dissenting opinion has been uniformly and summarily rejected by both State and Federal Courts. *See, e.g., Sullivan v. Dugger,* 721 F.2d 719, 720 (11th Cir.1983) (order); *Spinkellink v. Wainwright,* 578 F.2d 582, 616 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979); *Dix v. Newsome,* 584 F.Supp. 1052, 1068 (N.D.Ga.1984); *Mitchell v. Hopper,* 538 F.Supp. 77, 94 (S.D.Ga.1982); *Stripling v. State,* 261 Ga. 1, 401 S.E.2d 500, 506 (1991); *Buenoano v. State,* 565 So.2d 309, 311 (Fla. 1990); *Wallace v. State,* 553 N.E.2d 456, 474 (Ind.1990); *State v. Coleman,* 45 Ohio St.3d 298, 544 N.E.2d 622, 633 (1989); *Pruett v. State,* 282 Ark. 304, 669 S.W.2d 186, 189 (1984); *Stockton v. Com.,* 227 Va. 124, 314 S.E.2d 371, 378 (1984); *Booker v. State,* 397 So.2d 910, 918 (Fla.1981), *cert. denied,* 454 U.S. 957, 102 S.Ct. 493, 70 L.Ed.2d 261 (1981); *State v. Shaw,* 273 S.C. 194, 206, 255 S.E.2d 799, 804–805, cert. denied, 444 U.S. 957, 100 S.Ct. 437, 62 L.Ed.2d 329 (1979). *See also, State of Louisiana v. Resweber,* 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (carrying out execution of convicted murderer, after first execution failed due to mechanical defect in electric chair, did not constitute cruel and unusual punishment).

815 S.W.2d at 178–79 (footnote omitted).

The Tennessee Supreme Court addressed Petitioner's other constitutional challenges to his death sentence as follows:

The Defendant next contends that the trial court's exclusion of testimony, before a jury, about the procedures surrounding an execution, electrocution itself and the electric chair, denied him his due process right to a fair sentencing hearing. The Defendant filed a pretrial motion seeking admission of evidence 'concerning the nature and effect of electrocution.' The trial court overruled the motion following a pretrial hearing. The Defendant submits that the trial court's error in not allowing him to introduce evidence on the nature of electrocutions, was prejudicial because the jury was deprived of relevant evidence of procedures and circumstances surrounding electrocution during the sentencing hearing.

This Court has repeatedly refused to allow this type of evidence at sentencing in a death penalty case because it is irrelevant to the factors to be considered by the jury. This information is more properly presented to the Legislature. *See State v. Wilcoxson,* 772 S.W.2d 33, 39–40 (Tenn.1989); *State v. Adkins,* 725 S.W.2d at 665; *State v. Johnson,* 632 S.W.2d 542, 548 (Tenn.1982). The only evidence which is relevant during the sentencing phase in a capital case is that evidence which is relevant to establish or disprove the existence of aggravating circumstances or mitigating factors. *Cozzolino v. State,* 584 S.W.2d 765 (Tenn.1979).

\* \* \* \* \* \*

As his last issue, the defendant asserts that, for several reasons, the Tennessee death penalty statute is unconstitutional under the state and federal constitutions. In support of his argument that the death penalty statute does not provide adequate guidance to

the judge or jury, the defendant specifically contends that T.C.A. § 39–2–203(f) and (g) (1982)...: (1) have no prescribed standards of proof for determining whether statutory aggravating circumstances outweigh mitigating circumstances, (2) do not assign the burden of proof on the issue of whether aggravating circumstances outweigh mitigating circumstances, and (3) require a sentence of death if the jury finds that the statutory aggravating factors outweigh the mitigating factors. These specific contentions have been previously addressed and rejected by the Court in several cases. *See, e.g., State v. Boyd,* 797 S.W.2d 589, 597–99 (Tenn.1990); *State v. Thompson,* 768 S.W.2d 239, 252 (Tenn.1989); *State v. Wright,* 756 S.W.2d 669, 675 (Tenn.1988); State v. Melson, 638 S.W.2d 342, 368 (Tenn.1982); *State v. Pritchett,* 621 S.W.2d 127, 141 (Tenn.1981); *State v. Dicks,* 615 S.W.2d 126, 131 (Tenn.1981); *Houston v. State,* 593 S.W.2d 267, 276–277 (Tenn.1980).

815 S.W.2d at 179, 185 (footnote omitted).

The court also considered several state constitutional challenges made by Petitioner. *Id.*

On appeal from the post-conviction proceeding, the Tennessee Court of Criminal Appeals deferred to the Supreme Court's decision as to those challenges Petitioner repeated in the post-conviction. 1999 WL 195299, at *25–26. The court also rejected Petitioner's argument that his death sentence violates due process. *Id.,* at *26.

Petitioner has not advanced a reason why the decisions of the Tennessee courts were contrary to, or involved an unreasonable application of clearly established fed-

eral law. Thus, Respondent is granted summary judgment as to Petitioner's claims in subparagraph (d), (f), the due process claim in subparagraph (e), and subparagraph (g).[18]

*Paragraph 34: Constitutionality of Death Sentence—Length of Incarceration*

In Paragraph 34, Petitioner alleges that the length of time between the imposition of his death sentence and execution of that sentence constitutes cruel and unusual punishment, and violates the Eighth and Fourteenth Amendments. Petitioner concedes in response to the Respondent's summary judgment motion that there is no direct Supreme Court authority supporting this claim, but seeks to preserve the claim for further federal review. *See Knight v. Florida,* 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999)(Thomas, J., concurring in denial of certiorari; Breyer, J., dissenting from denial of certiorari). The Court agrees that there is no direct Supreme Court authority supporting this claim, and grants summary judgment to Respondent on this claim.

*Paragraph 35: Competency to be Executed*

In Paragraph 35, Petitioner alleges that he is not competent to be executed under *Ford v. Wainwright,* 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). In response to Respondent's argument that this claim is not ripe, Petitioner agrees that this claim would only become ripe upon the setting of an execution date following the conclusion of the federal proceedings, and suggests that the Court dismiss this claim without prejudice to litigating the claim if ripeness were ever established. Accordingly, this claim is

---

**18.** Also, with regard to the claim in subparagraph (d) regarding death by electrocution, this issue is moot in light of current Tennessee law providing that the method of execu-

tion shall be by lethal injection unless, by written waiver, Petitioner chooses death by electrocution. Tenn.Code Ann. § 40–23–114.

dismissed without prejudice to Petitioner's litigating this claim if and when it becomes ripe for decision.

*Paragraph 36: Denial of Full and Fair Post–Conviction Proceeding*

■ In Paragraph 36, Petitioner claims that he was denied a full and fair post-conviction proceeding in violation of his Sixth, Eighth and Fourteenth Amendment rights. Respondent argues, and the Court agrees, that this allegation does not state a cognizable independent claim for habeas relief. *Greer v. Mitchell,* 264 F.3d 663, 681 (6th Cir.2001); *Trevino v. Johnson,* 168 F.3d 173, 180 (5th Cir.1999); *Kirby v. Dutton,* 794 F.2d 245 (6th Cir.1986). The Court grants summary judgment to Respondent on this claim.

*Paragraph 37: Violation Of Right To Open Trial and Due Process*

In Paragraph 37, Petitioner alleges that the trial court violated his rights to due process and an open trial when it excluded Melba Corley (one of the Petitioner's relatives) from the courtroom if juror Ihrie were selected. Respondent argues that this claim was not raised in state court and is, therefore, procedurally defaulted. As Petitioner has not suggested a basis for setting aside the procedural default, Respondent is entitled to summary judgment on this claim.

*Paragraph 38: Instructions on Jury Unanimity*

Paragraph 38 of the Amended Petition alleges that the trial court's instruction to the jury that its verdict as to Petitioner's sentence had to be unanimous violates the Eighth and Fourteenth Amendments. Petitioner has failed to demonstrate that the trial court's charge as to unanimity (Addendum 3, Vol. 16, at 2358–2367) is constitutionally deficient. *See Scott v. Mitchell,* 209 F.3d 854, 875–76 (6th Cir.2000); *Coe v. Bell,* 161 F.3d at 336–339. Therefore, the Court grants summary judgment to Respondent on this claim.

*Paragraph 39: Cumulative Error*

In Paragraph 39, Petitioner alleges that the cumulative effect of the errors at his trial and on appeal violated his due process rights. Having reviewed the entire record, the Court concludes that any errors made by the state courts did not deprive the Petitioner of due process of law. *McKinnon v. State of Ohio,* 67 F.3d 300 (Table), 1995 WL 570918 (6th Cir. Sept.27, 1995).

## V. CONCLUSION

For the reasons set forth above, Respondent's Motion For Summary Judgment is granted.

It is so ORDERED.